# EXHIBIT 1(a)

# AGREEMENT

## between

# The Washington Post

## and

# Washington-Baltimore Newspaper Guild Local No. 32035

# July 13, 2018 – July 12, 2020

# Table of Contents

| Section | Subject | Page |
|---------|---------|------|
| Preamble | | 2 |
| Article I | Bargaining Unit | 2 |
| Article II | Jurisdiction | 3 |
| Article III | Union Access | 5 |
| Article IV | Union Security | 9 |
| Article V | Dues Check-Off | 9 |
| Article VI | Minimum Salaries | 10 |
| Article VII | Hours and Overtime | 18 |
| Article VIII | Holidays | 23 |
| Article IX | Individual Bargaining | 24 |
| Article X | Job Security | 24 |
| Article XI | Sick Leave | 28 |
| Article XII | Vacations | 29 |
| Article XIII | Leaves of Absence | 31 |
| Article XIV | Severance Pay | 34 |
| Article XV | Automobile Expense | 35 |
| Article XVI | Other Expenses and Supplies | 36 |
| Article XVII | General | 36 |
| Article XVIII | Non-Discrimination | 42 |
| Article XIX | Labor-Management Committee | 42 |
| Article XX | Phased Retirement | 43 |
| Article XXI | Pension Plan | 43 |
| Article XXII | Health and Welfare | 49 |
| Article XXIII | Grievance Procedure | 52 |
| Article XXIV | Computers and Work Stations | 55 |
| Article XXV | Savings Plan and Secure Retirement Account | 55 |
| Article XXVI | Fully Bargained | 58 |
| Article XXVII | Duration and Renewal | 59 |
| Appendix A | Exclusions | 60 |
| Side Letters | | 70 |

1

## **PREAMBLE**

AGREEMENT made this 13th day of July 2018, by and between The Washington Post, hereinafter referred to as The Post or the Publisher, and the Washington-Baltimore News Guild, Local No. 32035, The News Guild-Communications Workers of America, hereinafter referred to as the Guild, acting for and on behalf of itself and all Guild bargaining unit employees of The Post.

WITNESSETH: In consideration of the mutual covenants set forth in this Agreement, The Post and the Guild agree as follows:

## **ARTICLE I - BARGAINING UNIT**

1. (a) The provisions of the Agreement shall apply to all employees employed by The Washington Post in the Accounting, Administrative Services, Advertising, Circulation, Communications, Editorial, Marketing, Digital Advertising Sales, News and Purchasing departments; other business departments to the extent that Guild-covered positions are transferred to such other business departments; the maskers and scalers of the Production Department; the Centrex Operators and Mail Desk employees of the Administrative Services Department; and News Service employees.

   (b) The provisions of this Agreement shall not apply to employees deemed managers, supervisors, and confidential employees under the National Labor Relations Act; outside columnists whose material is syndicated by arrangement with The Post; outside circulation subscription solicitors; temporary employees as defined in the following paragraph; commission sales agents numbering no more than fifty percent of the number of Guild-covered advertising sales/outside representatives (provided that, as a result of an increase in commission sales agents above the number of 22, the number of Guild-covered advertising sales/outside representatives does not fall below seventy except during temporary periods of vacancies); part-time employees who do not satisfy the continuity requirements set forth in Article VI, Section 10(b); clerical or telecommunications employees hired outside the United States for employment in offices outside the United States; and other positions mutually agreed upon by the parties, including those positions listed in Appendix A to the 2015-2017 Agreement.

2

(c)     A temporary employee is defined as a person hired or contracted through a temporary agency for an occasional   or transient purpose, or for a special project not to exceed twelve months in duration, which period may be extended by mutual agreement, or as a replacement for a regular full-time or regular part-time employee on a leave of absence granted under Article XIII, or on extended illness or disability provided such leave of absence does not exceed two years; The Post agrees it will continue to notify the Guild of the hiring of all temporary employees, after any such employee has been employed by The Post for a period of three months.

2.     The Post shall notify the Guild of the creation of new, excluded positions, or the reclassification or alteration of current positions, that The Post in its discretion judges should be excluded from the bargaining unit, based on its reasonable belief that the position is managerial, supervisory or confidential.

3.     It is understood and agreed that, consistent with other provisions of this Agreement, the Publisher shall be the sole judge of which person, or persons, shall be hired in any capacity for positions covered by this Agreement, including, specifically, those persons selected as News interns.

## **ARTICLE II - JURISDICTION**

1.     It is mutually agreed that the jurisdiction and work assignment flexibility herein does not conflict with the basic components recognized by the parties in the Agreement of a Guild bargaining unit, and that work is to continue to be performed by Guild-covered employees in the Guild bargaining unit.

2.     The Publisher may assign or reassign work which has been previously assigned to Guild-covered employees either to such employees or to employees not covered by this Agreement, or to employees of any other employer. In addition, the Publisher may assign or reassign work to Guild-covered employees which has been previously assigned to employees not covered by this Agreement or to employees of any other employer. It is the intent of the parties to construe this Agreement as fundamentally altering the nature of work assignments and to allow the Publisher in his or her discretion to assign Guild-covered employees to perform whatever work the Publisher deems appropriate in connection with any print, web, multimedia or other projects, partnerships or activities in which The Post directly or indirectly participates, presently or in the future, whether such projects, partnerships or activities are known or unknown as of the execution of this Agreement.    Work

3

assignments will be non-exclusive, allowing The Post to assign work previously performed by persons outside the Guild unit to Guild-covered employees, as well as assigning Guild-covered work to non-Guild-covered employees on the same basis. The foregoing shall not affect the kinds of work presently or customarily performed by persons holding positions that are excluded from the bargaining unit under the provisions under Article I above.

3. No employee covered by this Agreement shall be disciplined for the quality of his/her performance of work not normally or previously assigned to employees in the bargaining unit until he or she has had a reasonable opportunity to be trained in such work.

4. It is understood that the Publisher shall have the sole right to determine the manner and means of operation and production, except as specifically limited by this Agreement.

5. The Publisher will meet and confer with the Guild on changes in work assignments, jurisdiction, work processes, or technology. It is agreed that, if the parties are unable to resolve any dispute arising under this Article by discussion and mutual agreement, such dispute will not be arbitrable and will not be subject to mid-term bargaining.

6. With respect to the News and Editorial Departments, The Post may continue to engage outside writers on a non-staff basis, e.g., freelance, stringer, contract writer, blogger or photographer. The Post may continue to buy stories and photos from non-employees who have produced an exclusive, or an outstanding, story or photo, and may continue to publish the products of syndicated writers or cartoonists or artists. It shall not be a violation of this Agreement for non-staff newspersons to consult on the premises with editors and others to discuss story ideas or work in progress, or to edit work submitted. In exceptional circumstances, it shall not be a violation of this Agreement for non-staff newspersons to use Post equipment on or off Post premises for the purposes of creating, editing or entering materials into The Post computer system. It is understood and agreed that an individual newsperson's staff or non-staff status shall be determined by the "right of control" test.

7. With respect to the Advertising Department, The Post may accept any and all copy from advertisers or advertising agencies in any form, including, but not limited to, hard copy, facsimile copy, or computer generated copy ("remote entry" copy). Furthermore, the remote entry of header information or billing information by non-Guild personnel shall not be a violation of this Agreement.

4

8.      With respect to any work processes in any Guild-covered departments, The Post may continue to use without restriction such data or information, produced within or outside of The Post, as it may deem appropriate in the Publisher's sole discretion.

9.      The parties' rights set forth in this Article II shall remain in effect both during the term of this Agreement and after its expiration.

## ARTICLE III - UNION ACCESS

1.      Access for Representational Purposes

        The Washington Post will continue to permit access to The Post's offices for the staff representatives of the Washington-Baltimore Newspaper Guild, Local 32035, The Newspaper Guild-Communications Workers of America, for representational purposes only and subject to this Agreement.   Access for Guild representatives will at all times be through The Post's 24-hour Main Security Desk at 1301 K Street, N.W., Washington, D.C.  This will not include organizing activities, signing-up members, distributing union literature (except through employees), union business meetings, steward training, or other institutional activities.

2.      Union elections:

        The Guild agrees to hold all Guild elections at locations other than The Post's premises.

3.      Small Informal Meetings Among Unit Employees

        Nothing in this Article shall be deemed to preclude small informal meetings among unit employees, without a union staff representative present, provided such meetings are held in a non-working area during the non-working time of the involved employees.

4.      Access for Union representatives to meet with Guild members in Post building:

        Consistent with past practices, and with the understanding that the Guild will usually find it more convenient to meet at the Guild's offices or elsewhere outside The Post with Post stewards and employees, The Post will provide on-site meeting arrangements subject to availability only as described below:

5

(a)     Access for Membership Meetings.

It is understood and agreed that the Guild will not conduct membership or informational meetings for unit employees or any other group meetings with unit employees (except as provided in paragraphs 4(b) and 4(c) below) on The Post's premises, with or without Guild staff present. However, in exceptional circumstances, the Guild may request permission for space to hold such employee meetings on The Post's premises, which the Publisher may grant or withhold in his sole discretion.

(b)     Access for Committee Meetings.

(i)     Except as set forth in (ii) below, the Guild agrees that it has no right to conduct a committee meeting on Post premises, and cannot challenge The Post's denial of meeting space for a Guild committee meeting.

(ii)    During the course of collective bargaining for a new contract, on days when joint sessions take place, The Post will permit the Guild to use the joint meeting room for union caucuses and employee meetings related to the bargaining, subject to the joint meeting room's availability.

(c)     Meetings with one to three employees.

(i)     When a Union representative wishes to meet with from one to three Guild members employed at The Post, the representative first must register in a log maintained by a security officer in The Post's lobby, and phone the Labor Relations office as a prerequisite to the proposed visit. Such notice may be given immediately prior to the proposed meeting. In addition to listing his or her name in the log, the Union representative shall enter the name of the person whom he or she intends to visit and The Post department to which that employee is assigned. The Union representative must comply with all Security Department procedures applicable to visitors to The Post; in an operational emergency that results in the exclusion of visitors from Post facilities, the Guild representative will not be unreasonably denied access to The Post to conduct representational activities. The Union representative may meet either in the employee's department or kitchen area or on the fifth and sixth floor terraces, as long as no more than three employees and one Guild representative is involved. Consistent with past practice, e.g., including but not limited to, when a Guild

representative is being replaced by a new Guild staff member, and with the understanding that normally only one Guild staff representative is involved in such meetings, this provision may apply to a visit by two Guild staff representatives.

(ii) While the Union representative is in the Department designated in the log (as described in the preceding paragraph), he or she may meet with one, two or three employees in the same department without giving notice of such additional meetings to the Labor Relations Department. Except with the permission of the employee's supervisor, the Guild representative shall meet during regularly scheduled breaks or lunch periods with any employee who does not have a flexible work schedule, e.g., most employees in the Circulation, Accounting and Classified Advertising Departments. With employees who do have flexible work schedules, e.g., most employees in News, the Guild representative shall meet with such employees without interfering with their work or departmental operations. This provision will not affect in any way the respective rights of The Post and the Guild with regard to hours and scheduling of employees under the labor contract.

(iii) If a Union representative also wishes to speak with an employee in a Department other than the one designated in the log book, he or she shall first notify the Labor Relations Department of the employee's name and Department to be visited next, as in paragraphs 4(c)(i) and (ii) above.

(iv) As long as the procedures described in paragraphs 4(i) through (iii) are followed, management representatives will not generally question the Union representative(s) further. For example, questions may not be posed about the subject matter of the visit, whether the meeting could be held in an alternate location, etc.

(v) On rare or infrequent occasions, the Guild may request The Post to provide a meeting room for the Guild to meet with up to five or six employees who are not members of a committee. Such meetings will not be held in the employees' department(s) or kitchen area(s). If the Guild gives The Post at least 48 hours' advance written notice, the Labor Relations Department will make a good faith effort to provide a meeting room.

7

5.    Access Outside Normal Business Hours.

If a Guild representative seeks access to Post premises outside normal business hours (Monday to Friday, except holidays, 9 a.m. to 6 p.m.), he or she will make advance access arrangements through The Post's Labor Relations Department not later than 3 p.m. that same day if for an after-hours appointment that day, or not later than 3 p.m. on the last preceding regular business day if for a day other than a regular business day.

6.    Access for Distribution of Guild Bulletins.

A Guild staff representative may drop-off prepackaged bundles of Guild literature at The Post's Main Security Desk during normal business hours for pick-up by the Guild stewards to whom the pre-packaged bundles are addressed.   Guild stewards and/or employee distributors shall place Guild literature only in non-working areas of Guild-covered departments and shall not distribute such literature in working areas at any time, except that the past practice of allowing Guild stewards and/or employee distributors, after picking up the pre-packaged bundles, to hand such literature to employees or place it on employees' work stations in Guild-covered departments, or to place such literature in the departmental mailboxes (if any) of Guild-covered employees will be continued during the term of this Agreement so long as such distribution is conducted during the non-working time of the steward or employee distributor and does not interfere with or disrupt employees during their working time.  The parties will provide each other with copies of bulletins and like materials, which will be delivered in the same manner as they are distributed to employees.  The Guild agrees that this provision sets forth the exclusive manner of Guild distribution of literature on Post property, and further agrees that it will refrain from distributing its literature to Post employees through The Post's internal mail distribution system or through e-mail or computer systems of The Post.    This provision does not restrict the use of Post computer systems for incidental personal communications.

7.    Resolution of Disputes:

    (a)    In the event that either The Post or the Guild (or any of the Guild's officers, representatives, or agents) violates this Article, the Guild or The Post shall have the right to submit the dispute to arbitration under Article XXIII.

    (b)    The failure of either The Post or the Guild to enforce at any time any one or more of the terms and conditions of this Article shall not be deemed a waiver of such terms or conditions or of The Post's

8

or the Guild's rights thereafter to enforce each and every term and condition of this Article.

## ARTICLE IV - UNION SECURITY

As used in this Article, the term "membership in the Guild" means tendering the periodic dues uniformly required by the Guild. During the period of thirty calendar days following the signing of this Agreement, employees shall be given a choice of resigning, or retaining, membership in the Guild. Those who choose to retain membership in the Guild by the close of that period shall be obligated to tender the periodic dues required by the Guild, as an obligation of employment, until the next such open period, or contract expiration, whichever occurs first. Employees hired after the effective date of the Agreement who choose to become members of the Guild shall similarly maintain membership in the Guild. There shall be a similar resignation period of thirty days on each annual anniversary of the signing of this Agreement. The provisions of this Article shall not be administered in a manner that is contrary to law.

## ARTICLE V - DUES CHECK-OFF

1. Any employee in the bargaining unit, including covered part-time employees, may voluntarily file with The Post a written authorization and direction to deduct from his/her salary or other earnings, his/her periodic Guild dues, as certified to The Post by the Guild from time to time, and such authorization may be revoked by him/her at any time. The Post agrees to notify the Guild within seven days of the receipt of any such notice of revocation.

2. The Guild will file with The Post not later than the last day of each calendar month, a schedule certified by its Treasurer showing the amount of periodic dues payable during the next succeeding month by employees in the various salary classifications.

3. For the duration of this Agreement and the Union Security provision in Article IV, The Post will make deductions from the salaries or other earnings of employees in accordance with said authorizations and schedules filed hereunder by employees and the Guild, but it assumes no responsibility either to the employees or to the Guild in the event that, through inadvertence or error, it shall fail to do so in any instance. All sums so deducted shall be remitted by The Post as promptly as possible to the Guild. This provision does not preclude an agency fee payer from authorizing the payment of dues through payroll deductions. The Post agrees not to exercise its right to cease payroll deductions of dues to unrevoked dues check-off authorizations prior to termination of this

9

Agreement in accordance with Article XXVII. The Guild agrees to indemnify The Post and hold The Post harmless in the event of any claims, charges or lawsuits made in connection with dues collected consistent with the Guild's request or in connection with dues-related information provided by the Guild to its members.

4. Authorizations filed hereunder shall be in the following form:

"I hereby authorize and direct The Washington Post to deduct from any salary or other earnings standing to my credit on its books in each payroll period following the date of this authorization the amount of periodic dues payable by me to the Washington-Baltimore Newspaper Guild during such payroll period, according to the certified schedule filed by the Guild with The Post.

"I further authorize and direct The Washington Post to remit all sums so deducted to the Washington-Baltimore Newspaper Guild.

"This assignment and authorization shall remain in effect until revoked by me. I can revoke this authorization at any time. Such notice of revocation shall become effective for the calendar month following the calendar month in which you receive it.

"I agree to save The Washington Post harmless against any and all claims and liability for or on account of the deductions made from my salary or other earnings and remitted to the Washington-Baltimore Newspaper Guild pursuant to this authorization."

(Signature of Employee)

(Signature of Witness)

## **ARTICLE VI - MINIMUM SALARIES**

1. The following minimum salaries shall apply to employees in Guild-covered positions.

Editorial and News Departments:

2. The weekly salaries of employees in the following classifications shall be not less than the amounts specified.

Copy Aides

$526.21

10

| | |
|---|---|
| Administrative & Editorial Aides | $635.15 |
| Community Journalists | $739.43 |
| Assistant Librarians & Researchers | $871.23 |
| Librarian | $1077.83 |
| News Aides | $585.12 |
| News Interns | $929.98 |
| Photo Technicians, Video Technicians | $671.05 |
| Producers | $925.78 |
| Editorial Writers, Reporters, Photographers, Columnists, Critics, Information Designers, Digital Photo Editors, Digital Video Editors, Video Journalists | $1,077.83 |
| Editors(1) | $1,237.46 |
| Editors(2) | $1,184.26 |
| Editors (3) | $1,131.02 |

11

3. (a) News employees who are covered by this Agreement and employed as Assistant Foreign Editors, Assistant Editors/Layout, and Multi-Platform Editors (Editors (2) for purposes of the minimums above) shall receive a salary that is not less than 10% above the minimum reporter scale for their experience in such position.

   (b) News employees who are covered by this Agreement and who are employed as Assistant System Editors (Editors (3) for purposes of the minimums above) shall receive a salary that is not less than 5% above the minimum reporter scale for their experience in such position.

   (c) All other News employees who are covered by this Agreement and employed as non-supervisory Editors, Assistant Editors, Art Directors, Graphics Editors/Planners, or other specialized non-supervisory Editor positions (Editors (1) for purposes of the minimums above) shall be paid a salary that is not less than 15% above the minimum reporter scale for their experience in such position.

   (d) Part-time employees and full-time employees occupying the positions in this Section 3 for less than a week shall be paid a pro-rata amount as set forth above based on their experience and time worked in such position.

## Commercial Departments

4. The weekly salaries of employees in the following classifications shall not be less than the amounts specified.

Staff Associates

$562.68

General Staff Associates

$587.41

Circulation Drivers $619.15

Centrex Operators

$587.41

12

Secretaries (other
than Confidential
Secretaries)

$608.07

Advertising Services
Staff Associate

$594.24

Senior Staff
Associate

$635.25

Administrative Staff
Associate

$710.73

Class A Circulation
Drivers

$768.75

Principal Staff
Associate, Digital Ad
Ops Account
Manager, Digital Ad
Ops Contract
Manager, Product
Specialist, Product
Analyst

$755.10

Classified Telephone
Sales

$748.72

Classified
Inside/Outside Sales

$849.81

Advertising Sales/Outside,
Artists, Copy, Layout,
Adv. Make-up, Education
Sales Representatives;
Digital Sales
Representatives; Sales
Planners

$1,077.83

Acquisition Sales
Executive/Commissioned;
Major Accounts Team Sales
Associate

$897.66

13

T-2 Computer
Operator

$632.44

T-3 Senior
Computer Operator

$695.73

T-4 Data Processing
Programmers

$788.25

Desktop Publishing
Associates

$957.36

Zone Advertising
Representatives,
Prospecting Sales
Associates

$589.20

5.  (a)  Any employee who in the course of his or her regular work
        performs duties which fall within more than one classification shall
        be given that classification which occupies more than fifty percent
        of his or her time.

    (b)  In the event The Post creates a new or substantially new position
        within the bargaining unit, as the Publisher in his sole discretion
        may decide, and the duties of the new or substantially new
        position substantially differ from those of any existing
        classification for which a salary scale has been established, The
        Post agrees to notify the Guild at least ten working days before
        assigning the classification and salary scale, whether new or
        existing, to the new or substantially new position. Upon the
        Guild's request, The Post will negotiate with the Guild the
        appropriate classification and salary scale for the new or
        substantially new position for a period not to exceed the ten
        working days notice period (unless extended by mutual
        agreement), but the decision to assign a classification and salary
        scale shall not be subject to arbitration. If, at the end of
        negotiations, there is no agreement as to the classification and
        salary scale, the Publisher may nevertheless implement such
        classification and salary scale.

6.  Commission-Only Sales Representatives. The Post shall have the right to
    create Guild-covered commission-only sales representative positions and
    to determine, in its discretion, the structure and amounts of their

14

commission payments, the products that they sell, and the areas in which they operate. Prior to creating this position, The Post will meet and confer with the Guild to discuss the commission-only sales representative position. Employees in these positions will not earn a base salary, will not be eligible for any General Increase under Section 7, below, are not subject to the overtime requirements of the FLSA, and will be treated as fully-experienced Outside Advertising Sales Representatives for health insurance, vacation, sick leave, pension and other contractual benefits. No Post employee shall be transferred involuntarily to a commission-only sales representative position. The Post will operate with no more than 20 commission-only sales representatives during the term of this Agreement.

7.    General Increase.

   (a)    Effective the beginning of the first payroll period following the date of signing of this Agreement, full-time and part-time employees covered by this Agreement who are on the active payroll of The Post at that date and covered by this Agreement, shall receive a flat increase of $15.00 in weekly or $0.40 in hourly salary if part-time. Such increases shall be added to the minimum contractual rates set forth in Sections 2 and 4 above.

   (b)    Effective the beginning of the first payroll period following 12 months from the date of signing of this Agreement, full-time and part-time employees covered by this Agreement who are on the active payroll of The Post at that date and covered by this Agreement, shall receive a flat increase of $15.00 in weekly or $0.40 in hourly salary if part-time. Such increases shall be added to the minimum contractual rates set forth in Sections 2 and 4 above.

   (c)    The Publisher's agreement to pay the increases set forth in this Agreement does not obligate the Publisher to continue making increases after expiration of the Agreement, and the Guild waives any right to contend that the Publisher is obligated to continue increases after contract expiration, as part of the status quo, prior to the execution of any successor contract requiring such payments.

8.    Night Differential.

   For each shift worked that begins between 2:00 p.m. and 9:59 p.m., inclusive, the employee shall receive in addition to salary, the sum of $6.00; for each shift worked that begins between 10:00 p.m. and 5:59 a.m., inclusive, the employee shall receive in addition to salary, the sum of $7.50.

9.   Part-time.

(a)   Part-time employees, including those who were not in the bargaining unit by virtue of their working an average of less than fifteen hours per week, according to the formula set forth in Subsection (b) below, shall be paid at a rate that is not less proportionally than the minimum salary scale or rate provided for the employees' positions and experience.

A part-time employee who is covered by this Agreement is one who satisfies the continuity requirements set forth in Subsection (b) below.   A covered part-time employee will receive, on a pro rata basis, the holiday benefits provided under Article VIII [using the employee's regular schedule, or, if there is no regular schedule, using the average number of hours worked during the five weeks immediately preceding the holiday week as a basis], the vacation benefits provided under Article XII, the sick leave benefits provided under Article XI, the funeral leave benefits provided in Section 7 of Article XIII, the jury duty benefits provided in Section 10 of Article XVII, the parental leave benefits provided in Article XIII, Sections 4(a) and (b), respectively, and the severance benefits provided under Article XIV. In the event that the Publisher, in his or her discretion, extends the Matching Gift Contributions program to exempt part-time employees, the Publisher shall permit Guild-covered part-time employees to participate in such program at the same time and on the same terms.

Covered employees shall accrue vacation and sick leave credits for all weeks in which they qualify, according to Subsection (b) below up to a maximum of thirty-seven and one-half hours worked in any covered week.

Covered part-time employees are also covered by Section 12 below and by Article IV, Union Security, Article V, Dues Check Off, Article X, Job Security, and Article XXII, Health and Welfare, of this Agreement.

(b)   Every six months there shall be a review of the record of all hours worked by part-time employees for the 26 preceding weeks. Part-time employees who averaged fifteen or more hours per week during the 26-week preceding period shall qualify for the benefits set forth in Subsection (a) above for the succeeding 26-week period. Employees who do not satisfy this formula shall not be entitled to said benefits during the succeeding 26-week period except that all hours worked shall be counted toward accrual of

16

severance pay benefits. The Post will communicate on its electronic sites to part-time employees and in writing to the Guild, on an annual basis, the accounting periods that it will use to determine continuity requirements.

10. Salary Reductions.

No employee shall have his or her regular weekly salary including merit increases reduced without good cause.

11. Vacancies in Higher Classifications.

When seeking to fill vacancies in existing or newly created staff positions covered by this Agreement, The Post shall post notices of such vacancy, and coincident with such posting, The Post may advertise for filling any such vacancy. Copies of postings will be furnished to the Guild by the Labor Relations Department, either electronically or in hard copy, on a regular basis. The Post will continue to make job postings available electronically to employees. In the filling of such vacancies, The Post will, whenever practicable, give first consideration to current employees and thereafter to temporary or replacement employees then on the payroll, but the decision as to which applicant to select shall be in the sole discretion of The Post. For good cause, The Post may determine that the posting of a vacancy is inappropriate, e.g. where the vacancy will not be filled, where a candidate for a position has special qualifications related to the vacant position, or where other exceptional circumstances exist. However, it may be appropriate to post a vacancy even when a strong candidate exists, with this fact noted on the posting. It may also be appropriate to limit certain postings to a single department. In each such instance where The Post decides not to post a vacancy, it will so notify the Guild. Disputes concerning this Section shall be subject to the grievance procedure, but shall not be arbitrable under Article XXIII.

12. (a)     When an employee accepts a promotion to a position in a higher classification, he/she shall have a tryout period for the same time as for the probationary period provided under Article X and he/she shall be paid at the beginner's rate for the higher classification, but not less than his/her previous rate. The Post shall notify the employee in writing after his/her promotion to a position in a higher classification, whether his/her performance is satisfactory or unsatisfactory with all of the factors involved in making this determination. A copy of each satisfactory or unsatisfactory notice, which shall be given in accordance with the time periods provided under Article X, shall be sent to the Guild.

17

(b)    An employee moved from a lower to a higher classification shall earn no less than the minimum salary of that higher classification or, if higher, the employee's current rate of pay.

13.    The Post agrees that in the event an employee in a lower classification who applied to fill a vacancy in a higher classification, or an employee who applied to be transferred to a vacancy in the same classification, is not selected for such promotion or transfer, such employee shall be notified upon his/her request as to the reasons therefore, and shall be informed for his/her guidance as to whether he/she is considered likely to be found suitable for such promotion or transfer at a future date.

14.    If a general increase is granted while an employee is on a leave of absence as specified in Article XIII, such employee, upon return to work, will receive the amount of the general increase as if the employee had been on the active payroll at the time the increase was granted.

15.    During the term of this Agreement, and consistent with applicable laws, unit employees will be eligible to participate in the Commuter Benefits program, which allows The Post, upon the request of an employee, to deduct from the employee's biweekly paycheck, on a pre-tax basis, up to the maximum allowed by federal law, for out-of-pocket work-related parking and/or mass transit commuting expenses, pursuant to the rules of the Commuter Benefits program. The Post will meet and confer with the Guild, upon request, as to any changes to this program or its administration, but such changes shall not be subject to bargaining or arbitration.

## ARTICLE VII - HOURS AND OVERTIME

1.    The regular work week shall consist of thirty-seven and one-half hours (exclusive of lunch time) in not more than five days.  The regular work day shall consist of not more than seven and one-half hours in not more than eight and one-half consecutive hours.  Work in excess of thirty-seven and one-half hours in any week, or seven and one-half hours in any one day, may be required of any employee.  When such work is required, the employee shall be paid at the straight-time rate for up to forty hours worked in a single work week.

2.    Overtime work, which may be required of any employee, shall be compensated for by additional pay at an hourly rate equal to one and one-half times the employee's regular straight-time hourly rate for all hours actually worked in excess of forty hours in a single work week. Part-time employees shall be paid at the overtime rate for all hours actually worked in excess of forty hours worked in a single work week. For purposes of this article, hours worked shall include paid sick leave,

18

paid vacation, and holidays paid but not worked. Travel time shall be considered as time worked for the purpose of computing overtime compensation to the extent required by law. No employee, however, shall be compensated for travel time on any day for which the employee receives compensation under Section 4.

Employees eligible for overtime pay under this provision must accurately report the number of regular and overtime hours actually worked. Such overtime-eligible employees are not permitted to work hours outside their scheduled shift unless specifically authorized by a manager or supervisor.

3. Days off shall be consecutive throughout, wherever practicable, and a day off shall consist of at least twenty-four hours, and two days off shall consist of at least forty-eight hours. No employee shall be scheduled to begin work within more than two (three in the case of Circulation Drivers) starting periods during any one work week, except as provided in Section 10 below. Schedules of days off and starting times for the News, Editorial, and Commercial Departments shall be posted and shall continue in effect until changed on notice posted two weeks (one week in the case of Circulation Drivers) before the week in which the change occurs. In the event of a change made necessary due to a major news or operational emergency, or due to the need to implement, modify, or upgrade The Post's systems in a timely manner, or to cover the sickness or unscheduled departure of an employee, this section shall not apply. Schedules may be changed with less than two weeks notice with the consent of the employee affected. This section shall not apply to employees classified as part-time on-call.

4. In computing overtime, a day on call, that is a day on which an employee is required to hold himself or herself available for a call to work, shall be considered a day worked. Leaving a mail, electronic mail, or telephone address with The Post when the employee's freedom is not unreasonably interfered with shall not be deemed a day on call.

5. Except as provided in section 8 below, any full-time employee subject to the overtime requirements of the FLSA who is required to return to work after leaving the place where the employee's day's work was completed or to report to work on his or her day off, shall be paid for the actual time worked on the recall or the day off at the straight-time rate (up to 40 hours in a single workweek), but in no event for less than three hours calculated at the overtime rate. All regular schedules shall allow ten hours between shifts, except where the employee requests or voluntarily works a schedule with less than ten hours between shifts, with the Publisher's approval, and any employee subject to the overtime requirements of the FLSA who is required to start a day's work less than

19

ten hours after the completion of the previous regular work day shall receive one and one-half times pay for the time worked before the lapse of that ten-hour period.

6. Accrued overtime due an employee at the end of the employee's service shall be paid in addition to other sums due the employee.

7. Nothing contained in this Agreement shall require The Post to compensate any employee more than once for any overtime.

8. Sections 1 through 7 of this Article VII shall not apply to regular Editorial Writers; Display and Outside Sales Representatives and Acquisition Sales Executives; Cartoonists; Columnists; Critics; Producers; Writers and Photographers assigned to cover the training or playing trips of any teams engaged in major professional or college sports, which trips require the employee to be away from home for one or more nights; Reporters doing out-of-town survey stories; Political Writers following speaking tours or doing a series of "political roundup" stories; Reporters on foreign service; employees whose regular weekly salaries are at or in excess of $1,352.00; and any other employees in positions or classifications that are exempt from the overtime provisions of the FLSA. Provided, however, where an employee is covered by the functional designations of work assignments specified above in this Section, or whose regular salary is at or in excess of the amounts set forth above, works on a day outside their regular weekly schedule, the employee shall be given for each such additional day worked a compensatory day off to be used or paid out as follows:

   (a) Compensatory time earned between January 1 and June 30 of each year must be taken no later than December 31 of the year in which it was earned, and compensatory time earned between July 1 and December 31 of each year must be taken no later than June 30 of the year following the year in which it was earned.

   (b) Compensatory time may not be accumulated or carried forward beyond the deadlines set forth in this provision, except that, under extraordinary circumstances, an employee may request an extension of the above deadlines, which the Publisher may grant or deny in his discretion. Any compensatory time not taken in accordance with subsection (a) above will be paid at the straight-time rate, as soon as practical following the deadlines for taking compensatory time set forth in subsection (a) above, up to a maximum of twelve days per year; provided that, in extraordinary circumstances, an employee may request to be paid earlier for unused comp days and, with the express

20

written approval of the Publisher, may be paid up to a maximum of twelve comp days per year.

9. Notwithstanding Sections 1 and 3 above, the Publisher, in his or her sole discretion, may schedule full-time employees to work flexible schedules of 37½ hours per week, divided into six, five, or fewer days, based on the Publisher's operational needs and/or the employee's request, provided that no employee will be required to work a flexible schedule consisting of six days in any one work week. Part-time employees may, in the Publisher's discretion, be scheduled to work part-time hours divided over six, five or fewer days, based on the Publisher's operational needs and/or the employee's request, provided that no part-time employee will be required to work six days in any one work week. To the extent practical, before requiring full-time employees to work flexible schedules of less than five days based on the Publisher's operational needs, the Publisher will make reasonable efforts to fill such schedules with employees in the same classification who volunteer for such schedules.

10. Should the Department of Labor issue new regulations exempting certain employees covered by this Agreement from the hours and overtime requirements of the FLSA, or subjecting them to such requirements, immediately upon the issuance of such regulations by the Department of Labor, the parties shall meet for the purpose of bargaining on the impact of such regulations on employees working in such classifications under this Agreement, and to determine the extent to which such employees shall be covered by the provisions of Sections 1 through 6 above. This Agreement may in like manner be amended by mutual agreement of the parties to comply with any Act of Congress or judicial decisions binding on the parties. Nothing in this provision shall be deemed to waive either party's rights under the National Labor Relations Act or to preclude either party or any employee covered by this Agreement from exercising their respective rights to seek judicial or administrative relief concerning such regulations, Act, or judicial decision, e.g. an action to clarify or challenge any of the foregoing.

11. Telecommuting

    a. The Publisher and the Guild recognize that telecommuting arrangements can be beneficial to the company and its employees. In situations where telecommuting meets The Post's business needs and operational requirements, the Publisher (1) may require and implement telecommuting arrangements in appropriate work units and (2) may consider employee applications for telecommuting privileges on an individual basis. The decision to require, grant, deny or rescind telecommuting arrangements, and

21

the determination of the appropriate telecommuting schedules, rest in the Publisher's discretion.

b.   In the event that the Publisher decides to require employees performing particular functions in a work unit to telecommute, the Publisher will first seek volunteers in that work unit to telecommute, before requiring any employee to telecommute. The Publisher will consider excusing an employee from required telecommuting if the employee demonstrates unique personal circumstances that preclude telecommuting.

c.   Employees required or allowed to telecommute must understand the following:  Telecommuting days are considered the same as work days.  Telecommuting employees must have an appropriate work site for telecommuting purposes, must have compatible computer, internet access and other technology to support telecommuting, and must be available by phone and email, or other agreed upon communication medium, during their regularly scheduled work hours. Where the Publisher requires an employee to telecommute, the Publisher will assist the employee in developing an appropriate worksite for telecommuting purposes. Telecommuting employees are required to check their voicemail and email at regular intervals, to be determined by their supervisor, and to respond to messages in a prompt manner. Telecommuting employees are expected to be at their approved work sites and performing work tasks during their regularly scheduled work hours.  Telecommuting employees must provide their supervisors with an accounting of the time when they work from home or other remote location, at intervals specified by their supervisor; must allocate their time to various projects or assignments as specified by their supervisor; and must report back to their supervisor per the supervisor's instructions.

d.   The Post has the right to measure and assess the performance of telecommuting employees to ensure that the quality and quantity of their work meets or exceeds expectations.  The Post has the right to modify or terminate any telecommuting arrangements and schedules, either temporarily or permanently, at any time, in its discretion, and The Post's decision shall not be subject to arbitration. The decision to modify or terminate a telecommuting arrangement will not, in and of itself, be considered disciplinary action.

22

## **ARTICLE VIII - HOLIDAYS**

1.  Insofar as The Post's operating requirements permit, employees shall be allowed off the following holidays without loss of pay:

    New Year's Day, Martin Luther King, Jr.'s Birthday, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

2.  When an employee's regular day off falls on a holiday, he or she shall receive an additional day off during the period ending June 30 (for holidays occurring during the first six months of the year) or December 31 (for holidays occurring during the last six months of the year), or, at the option of The Post, be paid for the day at the straight time rate as soon as practical after June 30 or December 31, as the case may be; provided that, when Christmas Day  or New Year Year's Day fall on a weekend, The Post will make every practicable effort to give the employee a compensating day off on the Friday prior or the Monday following the Christmas Day and New Year's Day holidays; employees who do not work on this compensating day off will not earn an additional day off or an additional day's pay; employees who work on this compensating day off will receive an additional day off or an additional day's pay in accordance with the first sentence of this paragraph.

3.  When an employee's days off have been changed during a week in which a holiday occurs, resulting in such employee's working five straight-time days in such week such employee shall receive an additional day off within a six-month period ending June 30 (for holidays occurring during the first six months of the year) or December 31 (for holidays occurring during the last six months of the year), or, at The Post's option, be paid for such additional day off at the rate of time and one-half as soon as practical after June 30 or December 31, as the case may be.

4.  The Post has the right, in its discretion, to require employees to work on a holiday to meet reasonable operational needs.  When an employee is required to work on a holiday, the employee shall receive additional compensation for such work at an hourly rate equal to one and seven--eighths times the employee's regular straight-time hourly rate; provided, however, that no employee required to work any time on a holiday shall receive for such work an amount less than one and one-half times the employee's straight-time hourly rate of pay for the regular work day. An employee shall have the option of substituting a recognized holiday of the employee's choice for one of the holidays set forth in Section 1 above,

23

provided, in the opinion of the employee's supervisor or department head, it is practicable to do so.

5.   If overtime is payable under this Article and also under another Article of this Agreement, payment shall be made under the one which provides the greater compensation to the employee, but not under both.

6.   "Holiday", as used in this Agreement, means the day on which the holiday is legally observed, except that Christmas Day and New Year's Day shall always be observed on December 25 and January 1, respectively.

7.   The provisions of Sections 2, 3, 4, and 5 shall not apply to employees exempted from Article VII, provided, however, when such an employee works on a holiday, or a holiday falls on the employee's day off, the employee shall be given a compensating day off as provided in Section 2. Furthermore, if an employee is exempted from overtime pay under Article VII (because the employee's salary is above the overtime cutoff in Article VII), but the employee actually works on a holiday, then the employee will also receive, as additional compensation seven-eighths of the daily amount of the overtime cutoff.

8.   Employees who are on leave of absence from The Post shall not receive holiday pay for holidays not worked during the period of their leave.

## ARTICLE IX - INDIVIDUAL BARGAINING

The right of any employee to bargain individually with The Post for wages or conditions better than the minimum standards set forth in this Agreement is expressly recognized. The Post agrees not to bargain with any individual for, or enter into any agreement providing either a salary or condition less than the minima set forth herein.

## ARTICLE X - JOB SECURITY

1.   No employee shall be discharged as a result of the execution of this Agreement.

2.   (a)   Except as provided in Article XVII(12)(b), new employees, including Post employees previously working outside the unit, shall have a probationary period not to exceed six months unless extended by mutual agreement. The Post shall notify the employee in writing two months and four months after his/her initial employment whether his/her performance is satisfactory, including all factors

24

involved in this decision. A copy of this notification shall be sent to the Guild.

(b) New employees hired as Editors, Editorial Writers, Reporters, Photographers, Artists, Outside Advertising Sales Persons, Acquisition Sales Executives, Commission-Only Sales Representatives, or any other key minimum positions, and new employees hired in the Financial Accounting section of the Accounting Department, including Post employees previously working outside the unit, shall have a probationary period not to exceed nine months unless extended by mutual agreement. The Post shall notify the employee in writing three months and six months after his/her initial employment whether his/her performance is satisfactory, including all factors involved in this decision. A copy of this notification shall be sent to the Guild.

(c) The above probationary periods do not apply to a temporary employee hired into a Guild-covered position after working in that position on a temporary basis for at least a year.

(d) The above probationary periods do not apply to a person transferred to a Guild-covered position from a position that is supervisory, managerial or confidential.

3. No employee shall be discharged except for good and sufficient cause. Discharge of new employees with less than six months' employment [in the case of employees covered by Section 2(b) above, nine months' employment] shall not be subject to the grievance procedure. Failure to notify the employee and the Guild in writing of the employee's performance at the intervals specified in the probationary periods above shall not render discharge under this provision subject to the grievance and arbitration procedure. Two weeks' notice in advance of discharge, or two weeks' pay in lieu of notice, shall be given to employees with more than six months [in the case of employees covered by Section 2(b) above, nine months] or more continuous employment, except in the case of discharge for willful neglect of duty or gross misconduct. Employees with at least three months of service covered by Section 2(a) or 2(b) who are discharged during the probationary period shall receive one week's advance notice of discharge, or one week's pay in lieu of notice. Employees who are discharged shall be given written notice of their discharge, with the reason for the discharge, at or about the time of discharge, with a copy furnished to the Guild. Conferences regarding any discharge shall proceed with due diligence. Grievances concerning discharge shall be processed according to the procedures set forth in Article XXIII. In the event of a termination for failure to meet the Publisher's attendance or performance standards, the requirements of

25

progressive discipline shall be deemed to have been satisfied after the employee receives one written warning and one suspension. Nothing in this Agreement shall be deemed to limit the Publisher's right to discipline, suspend or discharge for just cause, or to discharge an employee without progressive discipline for gross misconduct or willful neglect of duty. Nothing herein, however, shall diminish the Publisher's obligation under this Section to take such disciplinary action only for just cause, nor does it limit the Guild's right to challenge, under Article XXIII, such disciplinary action on the basis that is was taken without just cause.

4.  (a)  When economy dismissals are to be made, four weeks' advance notice shall be given the employee, and the Guild shall be notified and severance pay shall be paid; provided, that such dismissals shall not be subject to review under Article XXIII unless the Guild feels that reasons other than economy have entered into a particular discharge.

    (b)  In the event that The Post determines to lay off employees in the Guild unit, after considering and, in its sole discretion, implementing any appropriate voluntary methods for reducing headcount pursuant to Article X(8), The Post will prepare a list of employees in the affected job classification(s) in the affected work area(s) and rank such affected employees in the order of their seniority of employment with The Post. The Post will proceed with layoffs in inverse seniority order, with the following exception: The Post may in its discretion exempt up to 30% of employees in the affected job classification in the affected work area from layoff for any reason that The Post deems essential to its operations; provided that, in all work areas of less than four employees, The Post may exempt one employee in the affected work area from layoff for any reason that The Post deems essential to its operations. Such exemptions shall not be subject to the Article XXIII grievance and arbitration procedure. Substitute voluntary resignations by longer term employees in the affected area will be given consideration by The Post in lieu of employees otherwise slated for separation, and if acceptable to The Post, such substitute employees voluntarily resigning shall be paid severance in accordance with Article XIV of this Agreement.

    (c)  Employees discharged for economy reasons, but not those employees whose substitute voluntary resignations are accepted by The Post, shall be placed on a rehiring list for a period of twelve months and shall be rehired, according to seniority, for the same or comparable jobs when such openings occur.

(d)     The parties' rights set forth in this Section 4(a-d) shall continue both during the term of this Agreement and after its expiration.

5.     The Post shall have the right in its discretion to adopt improved methods, or install new equipment, or use a new process. In the event that any full-time or regular part-time employee is displaced because of the adoption of improved methods or the installation of new equipment, or the use of a new process, such employee will be given, whenever practicable, the opportunity to be retrained at The Post's expense to meet The Post's needs for employment resulting from either new job opportunities or those that result from normal turnover, or given first consideration for an open position in a comparable classification for which he/she qualifies, or dismissed in accordance with the provisions of Subsections 4(a) and (b) above. Whenever practicable, The Post will notify the Guild of its intention to introduce such major new or modified equipment, methods or processes. In the event that an employee is subject to discharge for economy reasons, The Post will make available outplacement services at The Post's expense.

6.     The Post will continue to notify affected accounting credit, classified advertising and circulation service employees of its telephone monitoring practices not less than annually. In the event that The Post implements new electronic methods of assessing employee performance, it is understood and agreed that The Post will give affected employees adequate notice. All new employees in affected positions will be informed of such practices.

7.     <u>Security and Safety Monitoring</u>.

(a)     In connection with security and safety concerns, including the need to investigate or protect against theft, violence, or destruction of Post property, the Publisher shall have the right in his or her discretion to install surveillance cameras or other monitoring equipment, provided that such equipment shall not be installed in restrooms. Before implementing such surveillance equipment, The Post will offer to meet and confer with the Guild on a confidential basis, but shall not be required to disclose the locations of any surveillance cameras. The Guild agrees not to publicize or otherwise disclose confidential information concerning such surveillance or the location of surveillance cameras.

(b)     Images or other information collected through video cameras or other such safety/security surveillance will not be used to assess or evaluate employees' job performance. In addition, such images will not be released to third parties except to the extent disclosure is made in any arbitration or other legal or administrative

27

proceeding; is required by a subpoena or court order; or is necessary in connection with notification to law enforcement authorities of possible criminal conduct. The Post will notify the Guild promptly in the event that it releases such images or other information collected through safety/security surveillance of a Guild-covered employee to law enforcement authorities.

(c)     The Post will notify employees, in writing at least once a year, of the general presence (but not the number or location) of video or other surveillance systems in the workplace.

8.     For the Publisher's operational needs or in lieu of discharge for economic reasons, the Publisher may offer window plan incentives to employees covered by this Agreement to secure their voluntary agreement (a) to resign or retire from employment by the Publisher; or (b) to transfer from full-time status to part-time status; or (c) to transfer to another department at The Post.    Before offering a window plan as described above, The Post will provide the Guild with ten working days' notice and will, upon request, negotiate the terms of the Plan with the Guild for a period not to exceed the ten-working days notice period (unless extended by mutual agreement), but the decision to offer such a plan shall not be subject to negotiation or arbitration, and its terms shall not be subject to arbitration. If, at the end of negotiations, there is no agreement as to the terms of such window plan, the Publisher may nevertheless offer such plan to employees.

## **ARTICLE XI - SICK LEAVE**

1.     Employees covered by this Agreement shall earn, in each twelve-month period during their first twenty years of employment, up to fifteen days of sick leave. Such sick leave shall be accrued on an hourly basis, based on straight-time hours worked or paid up to a maximum of thirty-seven-and-one-half hours in a workweek, and such sick leave shall be used for bona fide illnesses, unless clearly arising from the employee's own misconduct. For the purpose of this paragraph, absence during working hours due to emergency sickness, psychiatric, medical or dental care, shall be considered a bona fide illness where it is not possible for the employee to schedule such emergency care during non-working hours. Any such sick leave not exhausted by an employee during the twelve-month period to which it relates may, in case of bona fide illness not arising from his or her own misconduct, be accumulated to a maximum accumulation of one hundred thirty-five days. Additional sick leave may be granted at the discretion of The Post.  Sick leave under this Section shall be construed to include sick leave due to the illness of a dependent child up to age 18 or a disabled child regardless of age. An employee may

28

also use up to 120 hours of accrued sick leave while on approved FMLA leave due to the serious health condition of a covered person other than the employee or dependent child as provided above. The Post may in any case require an employee to submit a certificate of a reputable physician, or may have him/her examined by a physician of its own selection, in order to determine whether such employee is entitled to sick leave hereunder. In case of the illness of a dependent child as provided above, The Post may require the employee to submit a certificate of a reputable physician. Sick leave may also be used for absences covered by the District of Columbia's Accrued Sick and Safe Leave Act.

2. After twenty years of continuous Post employment, employees will be offered a one-time option of either (a) continuing to earn up to fifteen days of sick leave as provided in paragraph (1) above, or (b) beginning to earn twelve sick leave days each year, three of which may be used as personal leave days; in extraordinary circumstances, an employee may request to change this election, which the Publisher may grant or deny in its discretion. These personal leave days may be used for absences due to the illness of the employee or the employee's dependent child up to age eighteen, or for a personal reason. In the event that an employee wishes to take two or more consecutive work days off for a personal reason, such days shall be scheduled in advance with the employee's supervisor, who will not unreasonably refuse permission for the use of such accumulated personal leave. If an employee does not use all of his or her personal leave days in the one-year period during which they were accrued, the unused personal days shall convert automatically to sick leave days, which the employee may accumulate up to the one hundred thirty-five day maximum in Section 1.

3. An employee may not take sick leave during an absence for which the employee is eligible to receive Worker's Compensation benefits.

4. Each employee's sick leave balance shall be available to employees in The Post's password-protected system providing electronic confirmation of employee pay.

5. This Agreement waives any requirements of the District of Columbia's Accrued Sick and Safe Leave Act that are inconsistent with the terms and conditions of this Agreement.

## ARTICLE XII - VACATIONS

1. For the purpose of this Article, "vacation" shall mean vacation with pay, and "employment" shall mean regular, full-time and covered part time, continuous employment at The Post.

29

2.   Employees shall earn vacation during each employment year in accordance with the following schedule:

   (a)   Employees who have completed twenty years or more of employment, 7.5 hours of vacation for each 88.50 hours paid at the straight-time rate up to a maximum of 165 hours (four weeks and 15 hours) a year.

   (b)   Employees who have completed four years or more of employment, 7.5 hours of vacation for each 97.50 hours paid at the straight-time rate up to a maximum of 150 hours (four weeks) a year.

   (c)   Employees who have completed less than four years of employment, 7.5 hours of vacation for each 130 hours paid at the straight-time rate up to a maximum of 112.50 hours (three weeks) a year.

3.   No employee shall be required to accept three weeks of the employee's vacation at any time except between May 1 and October 31. No more than three weeks' vacation may be taken consecutively without the permission of The Post. The Publisher, in his or her discretion, shall determine vacation schedules within each working unit, taking into account company-wide and departmental seniority, operational needs and other circumstances. With the consent of an employee and The Post, a vacation may begin on any day of the week. The Post will determine the number of employees to be on a vacation at any one time. Accrued vacation may be taken in increments of less than one week only with the prior approval of the supervisor. Employees are responsible for accurately reporting the number of vacation hours actually taken.

4.   If the vacation period of an employee embraces a holiday, as defined in Article VIII, the number of days chargeable as vacation for that period shall be one less than the number of days that would otherwise be chargeable.

5.   (a)   Employees' vacation balances shall not exceed the maximum amount of annual vacation credits that an employee can earn under Section 2 above at any time. Notwithstanding the foregoing, any vacation credits unused as of an employee's annual leave accrual date shall be automatically transferred into a "deferred vacation" account. Such deferred vacation must be used within the next twelve months, and any deferred vacation balance remaining at the end of such 12-month period will automatically be forfeited. The deferred vacation account cannot exceed the maximum amount of annual vacation credits that an employee can earn under Section 2 at any time. When an employee takes

30

vacation, vacation credits shall be deducted first from the deferred account and then, after the deferred vacation account is reduced to a zero balance, from the employee's current vacation accrual. Employees' pay stubs will reflect the balances in their vacation accounts.

(b)     Current employees who have deferred vacation credits in their deferred vacation account (which cannot exceed one year's worth of vacation) may elect voluntarily and anonymously to donate up to one-half of their deferred vacation credits to another employee if the receiving employee (a) is on an approved leave without pay under the federal Family and Medical Leave Act and/or the D.C. Family and Medical Leave Act; and (b) has exhausted all sick leave, vacation and other paid leave available to the employee, in accordance with the vacation donation procedures established by the Publisher.

6.     When an employee resigns or is discharged or dies, the employee (or beneficiary in event of death) shall be paid for any accrued vacation which the employee has not taken. Vacation shall accrue on an hourly basis from the beginning of the employee's latest year of employment. Employees shall not be allowed to take vacation not yet credited except in the Publisher's discretion. Where upon resignation or discharge an employee has taken vacation not yet earned at the time of resignation or discharge, the amount in dollars of such unearned vacation shall be deducted from any sums otherwise due the employee at the time of discharge or resignation.

7.     An employee on vacation who requires hospitalization during the employee's vacation period may request that the period of hospital confinement be considered sick leave.

8.     During the term of this Agreement, the Publisher may move from the current leave-accrual-date vacation system to a calendar-year vacation system for purposes of administering employee vacation. The Publisher agrees to meet and confer with the Guild prior to implementing such a change to the administration of employee vacation.

## ARTICLE XIII - LEAVES OF ABSENCE

1.     By arrangement with The Post, and in the Publisher's sole discretion, employees may be granted leaves of absence consistent with staffing requirements. An employee on leave of absence shall waive his/her right to reinstatement if he/she accepts other employment that conflicts with the interest of The Post, without the approval of The Post, or if the employee remains on leave for more than one year, without the approval

31

of The Post (except as provided in Section 8, below). Leaves for family or medical reasons shall be granted to the extent required by law.

2.    If an employee is elected or appointed to hold office in The Newspaper Guild or in the Washington-Baltimore Newspaper Guild, he/she shall, upon reasonable notice in writing, and operating conditions permitting, be given a leave or leaves of absence from The Post for a period or periods not exceeding two years; provided, that only one employee at any one time from a specific department, or an aggregate of three employees, at any one time, shall be entitled to such leave. Any such leave may be extended beyond such period by mutual agreement between The Post and the employee.

3.    An employee elected a delegate to a local or national meeting of either The Newspaper Guild, the Communications Workers of America, or the American Federation of Labor-Congress of Industrial Organizations shall, upon reasonable notice in writing to The Post, prior to the opening date of such meeting, and operating conditions permitting, be granted leave of absence for the duration of such meeting, provided that The Post shall not be required to grant to any employee more than thirty days' leave under this paragraph during any period of twelve consecutive months. The number of employees who may be granted a leave under this paragraph shall be limited to three at any one time. The number may be increased for a particular meeting when mutually agreed upon by The Post and the Guild.

4.    (a)    Parental leave (after the birth or placement for adoption of a child) of up to six months shall be available upon request to full-time and part-time employees, beginning immediately after the birth or placement for adoption of a child. Notice of parental leave shall be in writing and, for the purpose of The Post's records, the supervisor shall acknowledge receipt of the notice in writing. Work which may be performed at home may be offered to the employee and compensated at the daily straight-time rate, and any day's work at home shall not reduce or extend the period of leave.

      (b)    A full-time or covered part-time employee who has been continuously employed by The Post for one year or more shall be paid up to four consecutive weeks of parental leave, provided that such paid leave shall begin at the end of the mother's birth-related disability (or earlier if prescribed by a physician and the mother's sick leave has been exhausted) or within one month before or after the placement of the child for adoption and shall be taken all at once (unless approved in advance by The Post). In addition, during any period of disability before or after delivery, an employee shall be entitled to use sick leave which she has accrued, provided the

32

employee furnishes The Post with a statement from her physician that she is disabled. Accrued, but unused, sick leave shall be available to such employee upon her return to work.

(c)   In connection with paid parental leave under Article XIII(4)(b) of this Agreement, The Post agrees to allow Post employees with deferred vacation balances to donate deferred vacation to employees who either exhaust or will exhaust their accrued sick leave, vacation, or other paid leave available to the employee, during the period of the mother's birth-related disability. Donations of this kind shall be governed by the general vacation donation provision in Article XII(5)(b).

5.   Leaves of absence under this Article shall not constitute breaks in continuity of service, however the time spent on such leaves shall not be considered service time. Any full-time or part-time employee covered by this Agreement who enters into the Armed Forces of the United States or who serves as a military reservist or national guard member shall be afforded, at a minimum, the protections of the Uniformed Services Employment and Reemployment Rights Act, and The Washington Post Company's Military Leave Policy applicable to all Post employees, which provides benefits in excess of federal law.

6.   When an employee is elected to an office of the Washington-Baltimore Newspaper Guild, or as a member of the Washington-Baltimore Newspaper Guild Executive Council or as a delegate to the Greater Washington Central Labor Council, the employee may request that the employee's regular time off under Article VII of this Agreement, coincide with the regular meetings of those organizations. The Post will grant such request where it is not in conflict with the operating requirements of the Company.

7.   Bereavement Leave. When an employee covered by this Agreement has a death in the immediate family (defined as parents, spouse, brothers, sisters, children, mother and father of spouse, grandparents, stepmother, stepfather, domestic partner and their children (as defined in The Post's Flexible Benefits Program)), the employee shall, upon request, be granted a leave of absence for the purpose of attending the funeral, and the employee shall receive the scheduled work days off with pay that occur within either three days of the death or within a three-day period that includes the day of the funeral, provided the employee attends the funeral.

8.   If an employee is unable to work for a period of twelve months or more for any reason, the employee shall be deemed to have voluntarily resigned on the 366th consecutive calendar day of such absence, absent

33

an agreement in writing between the employee and The Post to extend such period in appropriate circumstances. Before treating an employee on medical leave as having resigned under this provision, the Publisher will furnish written notice to the employee and offer the employee the opportunity to provide medical documentation verifying that he or she is unable to work, at least every three months, and establishing that the employee will be able to return to active employment within a reasonable period of time not to exceed 24 months from the employee's first date of extended absence. Nothing in this provision shall impair the right of the Publisher to terminate an employee for just cause at any time or to terminate an employee who fails to return to work after exhausting his/her leave entitlements under this Agreement or under federal or state laws.

## **ARTICLE XIV - SEVERANCE PAY**

1. When an employee who has served The Post for more than six consecutive months in his or her latest period of employment is discharged for any reason with good and sufficient cause, other than willful neglect of duty, gross misconduct, layoff for economic reasons under Article X, or the Publisher's exercise of its Article II jurisdiction and work assignment rights, the employee shall be paid in addition to all other amounts due one week's salary for each twelve months, or major fraction of the employee's latest period of continuous employment, up to a maximum of fifteen (15) weeks of severance pay. Severance pay shall be computed on a basis of highest weekly salary received by the employee during the two years next preceding the termination of the employee's service.

2. When an employee who has served The Post for more than six consecutive months in his or her latest period of employment is laid off under Article X for economic reasons, the employee shall be paid, in addition to all other amounts due, three quarters of one week's salary for each six months, or major fraction of the employee's latest period of continuous employment, up to a maximum of thirty (30) weeks of severance pay. Severance pay shall be computed on a basis of highest weekly salary received by the employee during the two years next preceding the termination of the employee's service.

3. When an employee who has served The Post for more than six consecutive months in his or her latest period of employment is laid off under Article X as a result of the Publisher's exercise of its Article II jurisdiction and work assignment rights, including but not limited to, the Publisher's assignment or reassignment of work to employees not covered by this Agreement, or to employees of any other employer, the employee shall receive, at a minimum, the following notice and severance:

(a)     Forty-five days advance notice of layoff.

34

(b)     One week's salary for each six months, or major fraction of the employee's latest period of continuous employment, up to a maximum of forty-five (45) weeks of severance pay. Severance pay shall be computed on a basis of highest weekly salary received by the employee during the two years next preceding the termination of the employee's service.

(c)     For employees with less than ten years of service, six months of employer-paid COBRA premiums. For employees with ten or more years of service, twelve months of employer-paid COBRA premiums.

(d)     The Post will arrange for employees to attend, on an optional basis, a seminar hosted by an outside vendor that might include career and job search counseling, and/or retirement financial management and planning.

4.     The payment of severance under this Article XIV is conditioned on the employee's signing a release of claims in a form typically used by The Post. The enhanced severance under Section 3 shall not be available to an employee who is offered, but declines, both a window plan incentive under Article X(8) that includes benefits exceeding the enhanced severance under Section 3, and alternative employment with The Post in a comparable position in lieu of layoff.

5.     The Post may deduct from any severance payment hereunder any levy or tax thereon to which the employee is subject under Federal or State law.

6.     The Post (i) will apply the severance formulas and caps on layoff severance, contained in paragraphs 2 and 3(b) of Article XIV of the 2015-2017 Post-Guild Agreement, to any Guild-covered employees with 20 or more years of Post service as of the date of signing this Agreement (July 13, 2018), and who are laid off after the signing of this agreement through and including the date prior to contract expiration (July 11, 2020); and (ii) will provide the Guild-covered employees described in this paragraph 6(i)  with six months of paid COBRA if laid off under paragraph 2 of Article XIV during the time period described in paragraph 6(i) above.

## ARTICLE XV - AUTOMOBILE EXPENSE

Employees in the Editorial, News, and Commercial Departments who are authorized to use their own automobiles in the course of their employment shall be paid the current mileage rate allowance set by the Internal Revenue Service.   An employee shall also be reimbursed for tolls and parking fees incurred during the course of assigned duties. When in the course of assigned duties, it is necessary to park at the office, other than when first reporting for work or reporting back at the end of the day, The Post agrees to pay the actual parking charges incurred.

35

## ARTICLE XVI - OTHER EXPENSES AND SUPPLIES

1.    Employees shall receive all working supplies and material without expense to themselves and shall be reimbursed for all authorized actual working expenses, provided that such expense reimbursement requests (to be completed during working hours) are submitted as promptly as practicable, but no later than the earlier of (a) 90 days from the date the expense was incurred, (b) December 15 for expenses incurred in September, October or November, or (c) January 10 of the next calendar year for expenses incurred during December.   Employees using Post equipment shall provide a reasonable level of care when using Post equipment and shall report to work with such equipment necessary to perform their work.   Employees may be held responsible for paying the appropriate replacement cost for any lost, stolen or damaged equipment that is necessary for the performance of their work (including, but not limited to, cell phones, blackberries or computers), where the employee's gross negligence caused the loss, theft or damage, or where the employee has previously received a verbal warning for the loss, theft or damage of Post equipment, or for not having such equipment available to them.

2.    Any employee regularly employed at Washington, D.C., shall when assigned to temporary duty outside Washington, receive not less than his/her regular weekly salary and all legitimate living and all authorized actual working expenses incurred by him/her, provided that in any case where the assignment does not require the employee to remain away from his/her home over night, reimbursement for living expenses shall not include any items for which he/she would not normally be reimbursed if he/she had remained in Washington. In the event, however, an employee on a one-day-out-of-town assignment necessarily incurs expenditures for meals in excess of the amounts he/she would normally have incurred had he/she remained in Washington, he/she shall be entitled to reimbursement for such excess.

3.    When The Post consents in writing to the use of personal professional equipment, it will register such equipment and repair damage occurring during business use and will also cover such equipment for business use insurance. Consent to such coverage will not be unreasonably withheld.

## ARTICLE XVII - GENERAL

1.    Employees of The Post shall be free to engage in any activities outside their working hours which do not constitute service for any interest or publication, whether print, online, broadcast or electronic, in competition

36

with The Post, subject to such implementing rules as the Publisher may establish and, in the case of employees of the News and Editorial Departments, which are not in conflict with the implementing rules of those departments or the rules governing the Press Galleries of the Congress of the United States; provided that, without permission of The Post, no employee shall in the course of such activities use any material or featured title of The Post or exploit in any way his or her connection with it. Employees shall furnish The Post with a description of any existing outside employment and, in the future, shall give The Post advance notice of any contemplated outside employment. Upon receipt of the description or notice in writing of the outside employment contemplated, The Post shall notify the employee in writing of its approval or disapproval of such outside employment.   The Post may require employees to sign individual disclosure agreements in connection with implementing this conflict of interest section.

2.    No employee shall be required against the employee's will to work under conditions unreasonably endangering the employee's life or safety in pursuit of the employee's normal work assignment.

3.    An employee's by-line or photo credit shall not be used over the employee's protest.

4.    No employee shall be required to use his/her influence for any purpose other than the performance of his/her duties and responsibilities with The Post. No employee shall use his/her influence or position at The Post for other than the performance of his/her duties and responsibilities at The Post.

5.    The Post agrees not to have or enter into any agreement with any other Publisher binding such other Publisher not to offer or give employment to employees covered by this Agreement.

6.    The salaries of all full-time and part-time employees shall be paid bi-weekly and through direct payroll check deposit arrangements, including electronic paycards, consistent with the current waiver practice. The Post will continue to use a password-protected system to provide electronic confirmation of direct deposit to employees, in lieu of paper confirmations, with reasonable protections for employee privacy and the security of employees' payroll information.

7.    (a)    The Post will supply the Guild monthly with the name, home address, department, job title, date of birth, date of hiring, experience bracket, and experience anniversary date of every

37

employee hired during the preceding month who is in the unit represented by the Guild.

(b)     The Post shall furnish the Guild monthly with changes in classifications of employees covered by the contract, with the effective dates of such changes.

(c)     The Post shall furnish the Guild monthly with the names of employees covered by the contract whose employment has terminated, with the effective dates of such terminations and the reason for such termination.

(d)     The Post shall, upon the Guild's request, provide it with the names, addresses, gender, ethnicity, and departments of all Guild-covered employees once each year.

(e)     Each year after Annual Performance Appraisals are issued, The Post shall provide the Guild, upon the Guild's request, a report including a list of performance review scores for Guild-covered employees, listing the score, department (either news or commercial), age, race and gender of the employee who received that score.

The Post will provide the above information either in hard copy or electronic form. The Post will continue to use an automated system to ensure that it provides the Guild with the information identified in (a)-(c) above on a regular monthly basis. In addition, The Post will provide the Guild with the name and department of each new hire in a Guild-covered position on a regular bi-weekly basis.

8.     The Post will provide the Guild with one suitably placed bulletin board in each department covered by this Agreement, which shall be the only places where Guild notices, bulletins or other materials may be posted. However, individual employees shall be permitted to post Guild notices, bulletins or other similar materials within their individual work stations in a manner that does not interfere with employees' performance of work or the operations of the Publisher.

9.     No employee shall be transferred to regular full-time employment in another city outside the Washington metropolitan area without his/her consent. In the event of such transfer, the employee shall be reimbursed for legitimate transportation and moving expenses of himself/herself and family.

10. Any employee required to be absent due to a call for jury duty shall nevertheless be paid a full day's pay. Such absence shall be supported by a statement signed by the Clerk of the Court. In addition, any such employee shall be paid at the regular hourly rate for all time worked on Post business on such day, provided that the total payment shall not be in excess of the total daily payment unless the total time worked on The Post, plus time served on the jury, including reasonable travel time, exceeds the regular work day. The current contract is understood to have an offset for payment for jury service. There shall be no double collection for jury service. An employee required to appear in court as a witness or a defendant in an action which is job-related shall be paid his/her regular wages minus any payment received for such appearance.

11. (a) There shall be no discrimination against any person because of national origin, race, gender, gender identity, age, disability, marital status, sexual preference or orientation, political or religious affiliation, military veteran status, or participation or non-participation in union activities.

    (b) In order to accomplish the purposes of fair employment principles, The Post and the Guild shall appoint an equal number (not less than three, nor more than six) of representatives to a standing committee. This Committee shall meet at the request of either party. This Committee will have no authority to hear or attempt to adjudicate any grievances filed by individual employees. The Committee may make advisory, but non-binding, recommendations to the Guild and The Post on such matters as recruitment and promotion of employees. Any disagreements arising among and between members of the Committee or any rejection of recommendations by the Committee shall not be subject to the grievance procedures set forth in Article XXIII.

12. (a) The Post will continue its policy of offering formalized training programs to improve skills in present jobs or to prepare employees for advancement to higher positions, to the extent the Publisher chooses to do so in his or her sole discretion. Training opportunities will be offered on a non-discriminatory basis, and The Post will continue to provide training opportunities to employees, including minority and female employees, in an effort to upgrade skills for qualifications in higher classifications. Mandatory training or cross-training of employees shall occur during an employee's regular work schedule, or The Post shall allow an employee to change his or her schedule in order to attend such training at the applicable rate of pay.

39

(b)    (i)    The Post has the right to hire summer interns, who are not subject to the provisions of this Agreement, and to hire news interns for periods up to two years, which period shall be considered a probationary period. In hiring news interns, creating special opportunities or addressing special needs, including diversity, will be considered by the Publisher. News interns shall be governed by all provisions of this contract except Article X.

(ii)    News interns who are retained at the end of their internships shall have the period of the internships counted in full in determining their experience rating. Employees who have completed a news internship and are retained shall be considered to have completed probation. Nothing in this Article shall be construed as prohibiting The Post, in its discretion, from retaining an intern as a regular employee at or before the end of his/her internship. An employee already at The Post who is transferred to the position of a news intern may, at any time within the first ninety days of the employee's internship return to his/her former position or to a similar position with the same or similar classification and to the same salary to which he/she would have been entitled if he/she had remained in such classification or in such position.

(iii)    Upon request of the Guild, The Post will furnish the Guild a report of the number of interns and the number of months completed by each intern. The Post will post notices of any opening in the news intern program, whether through the graduation of a current intern, or the addition of a new intern position.    All news interns shall receive periodic evaluation of their work performance from their immediate supervisor.

13.    The Post has instituted and will continue in force during the term of this Agreement, a policy of group travel accident insurance covering employees working on company business while off company premises, affording protection against disability, dismemberment, and death. The policy will provide insurance coverage equal to five times an employee's basic yearly compensation, with a minimum benefit of $50,000 and a maximum of $750,000, with $250,000 minimum coverage whenever an employee travels as a passenger on any type of aircraft. Actual coverage and benefits and continuation of the policy are subject to the terms and conditions of the policy itself. If, during the term of this Agreement, the insurance carrier cancels the insurance contract, The Post will make a

reasonable effort to replace it with another insurance policy providing benefits comparable to those set forth above.

14. Washington Post Magazine articles, book reviews, travel pieces, food pieces, rail columns, Outlook, Weekly, Weekend and other articles, as well as photographs and graphics, prepared without assignment on the employee's own initiative and off duty time may be purchased at rates mutually agreeable to the Editor and the employee. The Post shall have first right of refusal. If The Post publishes the work, The Post shall own the copyright to the work unless otherwise agreed in writing, which, in the case of photographs or graphics, may include a one-time use arrangement. Should The Post decide not to publish, or, should the Editor and the employee not agree on a mutually acceptable rate, the employee shall be free to sell his/her material elsewhere, except as precluded by Section 1, Article XVII.

15. Guild-covered employees shall continue to have the right to review their individual personnel files at reasonable times designated by the Human Resources Department, not less than annually, and in connection with disciplinary action. Performance reviews and evaluations of employees covered by this Agreement are not subject to arbitration under this Agreement.

16. The Post shall provide training in safe work practices to employees as may be required by law. The Post will also provide the Guild with occupational safety and health testing data as may be required by law.

17. The Publisher may require employees who regularly drive Post-owned or Post-leased vehicles in the performance of their duties to furnish the Publisher with periodic proof that they hold a valid driver's license and to provide the Publisher with a release so that periodic driving record checks can be made.

18. The Post will make notices of training opportunities within each department available electronically to employees in that department.

19. The Post will provide notice to employees, on its internal electronic sites, of the availability of parking at Post-owned parking facilities and of favorable parking rates at independent parking facilities when such facilities offer preferential rates for Post employees.

20. Newsroom employees shall have access to digital metrics relating to their published content and how such metrics will be used.

41

21.  The Post will make a copy of the current Guild contract available to all employees on GuidePost.

## ARTICLE XVIII – NON-DISCRIMINATION

(a)  There shall be no discrimination against any person because of national origin, race, gender, gender identity, age, disability, marital status, sexual preference or orientation, political or religious affiliation, military veteran status, or participation or non-participation in union activities.   These prohibitions apply to, among other things, the compensation and promotion of existing employees.

(b)  In order to accomplish the purposes of fair employment principles, The Post and the Guild shall appoint an equal number (not less than three, nor more than six) of representatives to a standing committee.   This Committee shall meet at the request of either party.  This Committee will have no authority to hear or attempt to adjudicate any grievances filed by individual employees.   The Committee may make advisory, but non-binding, recommendations to the Guild and The Post on such matters as recruitment, pay equity and promotion of employees.   Any disagreements arising among and between members of the Committee or any rejection of recommendations by the Committee shall not be subject to the grievance procedures set forth in Article XXIII.

(c)  Employees who believe that they are being underpaid based on their demographic profiles have the right to initiate, on an individual basis, a pay equity review conducted by the Human Resources Department.

## ARTICLE XIX - LABOR-MANAGEMENT COMMITTEE

A Joint Labor-Management Committee shall be established which may make joint recommendations to The Post on any matter affecting relations between the parties, including, among others, new technology, methods of operation and work processes, the employee assistance program, occupational safety and health and part-time employees, and other such matters.   The committee shall meet once a month during the first twelve months of the contract, and no less than once every three months thereafter.   The Post and the Union shall appoint an equal number (not less than three, not more than five) of representatives to the committee.   Any disagreements arising among and between members of the committee, any rejection of recommendations by the committee, or any dispute concerning the committee or its activities, shall not be subject to the grievance and arbitration procedures set forth in Article

XXIII, nor shall the committee have the right to receive or adjudicate any grievance.

## ARTICLE XX - PHASED RETIREMENT

Employees who reach age 55 and have at least twenty years' continuous service with The Post may elect, with the approval of The Post, to work a reduced work week, with equivalent reduction in salary, or a reduced work year; provided, an employee who desires to avail himself/herself of this privilege shall give at least three months notice to the Department Head. The Post shall notify the employee of approval or disapproval within one month after receiving the notice. The reduced salary shall be applicable to vacation pay, sick leave pay, severance pay, and any other benefit tied to salary. The employee on phased retirement, whether on a reduced work week or a reduced work year, shall continue to be fully covered by the Health and Welfare Plan (Article XXII) at the applicable premium contribution rate for part-time employees. For the employee on phased retirement on a reduced work year, only the time worked shall be counted in determining whether or not the employee is given a calendar year's credited service under the established Pension Plan (Article XXI). As used in this Article XX, the term "continuous employment" shall not be deemed to have been broken by absences by paid sick leave, vacation, or leave without pay, it being understood and agreed that continuous service shall be considered broken by resignation, retirement, discharge (unless an employee is reinstated), or other termination.

## ARTICLE XXI - PENSION PLAN

1.  It is recognized that the "Amended (Pension) Trust" as described in the letter from The Post to the Guild dated July 30, 1979, was established to provide benefits to participants hired on or before August 31, 2009 under the terms of the Washington Post-Washington Baltimore Newspaper Guild Retirement Income Plan ("The Post-Guild Plan"), a component of the Pension Plan for The Washington Post and Companies. It is a unilateral Trust, and the sole and exclusive administration of such Trust and the pension benefits provided pursuant to the Plan will be the responsibility of The Post. The costs of administering the Plan shall be paid out of the Plan's assets.

2.  Effective August 31, 2015 (the "Plan Freeze Date"), participants in The Post-Guild Plan ceased to accrue benefits under The Post-Guild Plan (the "Plan Freeze"), and their accrued and vested benefits under the Plan were frozen as of the Plan Freeze Date. The Plan Freeze did not reduce or eliminate the vested benefits that Plan participants accrued prior to the Plan Freeze Date, and The Post will be obligated to make the necessary

contributions to the Plan, from time to time, to fund the accrued and vested benefits provided by said Post-Guild Plan.

3.  It is understood and agreed that The Post-Guild Plan will provide the benefits outlined in paragraphs 4 through 5 below to covered employees who were hired on or before August 31, 2009, who met the eligibility requirements of the Post-Guild Plan as of the Plan Freeze Date, and who are or become vested in the Plan, upon their termination or retirement from The Post. Effective September 1, 2015, active employees hired on or before August 31, 2009, and who were accruing benefits under the Post-Guild Plan prior to the Plan Freeze Date, instead became eligible to participate in the Cash Balance Retirement Program established for Guild-Covered Employees ("TWP Guild Benefits Schedule") effective September 1, 2009 and outlined in paragraph 6 below.

4.  (a)  Effective as of November 8, 2002, and subject to the Plan Freeze described in Paragraphs 2 and 3, above, for eligible employees on the payroll and retiring on and after that date, the normal retirement benefit under the Post-Guild Plan shall be the following:

> The sum of (i) .08% of the participant's Final Average Annual Earnings multiplied by his or her Credited Past Service, plus (ii) 1.75% of the participant's Final Average Annual Earnings multiplied by his or her Credited Service after April 1, 1974, less (iii) the appropriate Offset Allowance from the table below multiplied by the participant's Final Average Compensation, up to the Covered Compensation limit for the year in which the participant retires, multiplied by his or her Credited Service after April 1, 1974:

| Birth Date | Offset Percentage |
|---|---|
| Before 1/1/1938 | .62% |
| Between 1/1/1938 and 12/31/1954 | .59% |
| After 12/31/1954 | .56% |

> The amount in (iii) of the preceding sentence may not exceed .875% of the Participant's Average Annual Earnings which may not be more than the lesser of Final Average Compensation or Covered Compensation, multiplied by his Credited Service after April 1, 1974.

(b)  An Employee who begins receiving benefits before his or her Normal Retirement Date shall have his or her accrued benefit adjusted by the appropriate Actuarial Equivalent Factor:

| Participant's Age at Benefit Commencement | Early Retirement Factor |
|---|---|
| 64 | 98% |
| 63 | 94% |
| 62 | 90% |
| 61 | 86% |
| 60 | 82% |
| 59 | 78% |
| 58 | 74% |
| 57 | 47 |
| 56 | 43 |
| 55 | 40 |

These factors will be prorated based on the Participant's age to the nearest month as of the date the Participant's benefits begin.

5.  Cash Pension Supplement:

(a)  Eligibility.  Every employee who earns a benefit under The Post-Guild Plan will also earn a cash pension supplement.  In general, an employee becomes vested in the retirement benefit and cash pension supplement after completing five years of vesting service.

(b)  Amount of Cash Pension Supplement.  The amount of cash pension supplement is determined by the employee's years of service.  Effective July, 1, 2006, he/she earns $210 each full year of service. The following shows the size of the cash pension supplement that would accrue at various service levels.

| Years of Service | Annual Cash Supplement |
|---|---|
| 5 | $1,050 |
| 10 | 2,100 |
| 15 | 3,150 |
| 20 | 4,200 |
| 25 | 5,250 |
| 30 | 6,300 |

In general, years of service are equal to years of participation in The Post-Guild Plan. Years of service prior to 1991 will count in determining the size of the cash pension supplement.

(c)  Payment of Benefits.  The cash pension supplement shall be payable at the same time the employee begins to receive his/her regular pension benefits from The Post-Guild Plan.  The cash

45

pension supplement will be paid once per year each January. If the employee's retirement date is not a January 1, he/she will receive a pro rata amount for the first year at the time he/she receives the first monthly check. Future adjustments to the supplemental pension payments will be made at the discretion of the Publisher.

(d)     Form of Payment. If the employee receives pension benefits from The Post-Guild Plan in a form other than as a single life annuity, the cash pension supplement will also be payable in the same manner. For example, married retirees generally receive benefits in the form of a 50% Spouse's Benefit with reduced benefits payable for the retiree's lifetime in order that benefits will continue to the surviving spouse in an amount equal to 50% of the amount the retiree was receiving. In this case, the surviving spouse would also receive 50% of the retiree's annual cash pension supplement for life. If an employee retires early and elects to receive reduced benefit payments to start immediately, he/she shall also receive reduced payments from the cash pension supplement immediately.

6. TWP Guild Benefits Schedule of the Cash Balance Retirement Program.

(a)     Effective September 1, 2009, The Post established the TWP Guild Benefits Schedule to provide retirement benefits to unit employees hired on and after September 1, 2009. Effective June 30, 2015, the TWP Guild Benefits Schedule of the Cash Balance Retirement Program was closed to participation by any new unit employees hired on or after July 1, 2015, and participation in the TWP Guild Benefits Schedule of the Cash Balance Retirement Program became limited to (1) unit employees hired between September 1, 2009 and June 30, 2015, and (2) unit employees participating in the Post-Guild Plan as of the Plan Freeze Date, who instead became eligible to participate in the TWP Guild Benefits Schedule of the Cash Balance Retirement Program effective September 1, 2015. New unit employees hired on or after July 1, 2015, are eligible to participate only in the retirement plans described in Article XXV of this Agreement.

(b)     The TWP Guild Benefits Schedule is intended to be a qualified plan and will be part of the Cash Balance Retirement Program of the Pension Plan for The Washington Post and Companies ("TWPC Plan"). As such, the TWP Guild Benefits Schedule will be subject to the terms and provisions of the TWPC Plan, including its amendment and termination provisions, and will provide benefits to Guild-covered employees in accordance with the following benefit schedule for the term of this Agreement:

(i)     For each calendar year in which an eligible employee qualifies to participate in the TWP Guild Benefits Schedule, the employee's

46

cash balance account will be credited with "pay credits" which are a percentage of the employee's eligible compensation. A pay credit is equal to the product of the employee's eligible compensation for the plan year multiplied by the applicable percentage set forth below corresponding to such employee's years of credited service as of the first day of the plan year:

| Years of Credited Service | Percentage |
|---|---|
|  |  |
| Less than 5 | 2.25% |
| At least 5 but less than 10 | 2.75% |
| At least 10 but less than 20 | 3.25% |
| 20 or more | 3.75% |

(ii)    In addition, the TWP Guild Benefits Schedule will credit each eligible employee's cash balance account with interest credits each year there is an account balance, as defined and determined under the TWPC Plan.

(iii)    Employees become vested in the Cash Balance Retirement Program after three years of vesting service, as defined in the TWPC Plan. Employees are also considered vested upon reaching age 65 while still employed, regardless of years of vesting service. Benefits will be paid to eligible, vested employees after they terminate employment with The Post as well as any other Company in the Controlled Group, in the form of a monthly lifetime annuity or a single lump-sum payment, in accordance with the terms of the Program.

7.    The Post-Guild Plan and the TWP Guild Benefits Schedule of the Cash Balance Retirement Program (together "Guild Retirement Plans") may be amended by The Post consistent with the terms of the plans and applicable law. Such amendments will not be subject to mid-term bargaining or arbitration with the Guild, provided that they have no effect on the accrued or vested benefits or future benefit accruals of any Guild-covered employees, and do not reduce any employee's existing cash balance account. For administrative convenience or other legitimate business reasons, and in accordance with applicable law, The Post, in its sole discretion, may combine one or both of the Guild Retirement Plans with other pension plans that it maintains for Post employees, including, but not limited to, The Retirement Plan for The Washington Post and Companies; spin off one or both of the Guild Retirement Plans or any component plans previously merged with other Post pension plans; and/or make lump-sum payments from one or both of the Guild Retirement Plans to cover the accrued and vested benefits of

retirees under such Plans; it being understood and agreed that such actions will have no effect on the accrued or vested benefits, or negotiated accrual rates, of active Guild-covered employees. Before the Publisher makes any such changes, the Publisher will meet and confer with the Guild, at the Guild's request, as to such changes. The Publisher's rights to administer these Plans, as well as to amend or change them as provided in this subsection, shall continue both during the term of this Agreement and after its expiration.

## **ARTICLE XXII - HEALTH AND WELFARE**

1.   Full-time employees and eligible part-time employees, as set forth in Section 3 and 4 below, will continue to be eligible for coverage under The Washington Post Flexible Benefits Plan (the "Benefits Plan"), in accordance with its terms. Administration of the Benefits Plan, including selection of the administrator and any insurers, shall reside solely in The Post's discretion and shall not be subject to arbitration or bargaining with the Guild during the term of this Agreement and after its expiration.

2.   During the term of this Agreement and after its expiration, full-time employees and eligible part-time employees, as set forth in Section 3 and 4 below, will pay the same percentage contribution toward the premium costs for this benefit coverage that is paid by exempt and managerial employees of The Post, as periodically adjusted by The Post in its discretion.

3.   Part-Time Employees Working 30 or More Hours.

   (a)   Consistent with the Patient Protection and Affordable Care Act as amended ("Affordable Care Act" of "ACA"), part-time employees hired to fill a regular part-time schedule of 30 hours or more a week will be treated as full-time employees under The Post's Benefits Plan and will be eligible to participate in such Benefits Plan on the same basis as full-time employees while they remain on a regular part-time schedule of 30 hours or more a week, subject expressly to the provisions set forth in this Article.

   (b)   Consistent with the ACA, part-time employees who are not described in Section 3(a), but who average 30 or more paid hours per week during the measurement period set forth in Section 3(c) below, will be treated as full-time employees under The Post's Benefits Plan and will be eligible to participate in such Benefits Plan on the same basis as full-time employees for the succeeding stability period set forth in Section 3(c) below, subject expressly to the provisions set forth in this Article.

49

(c)     The measurement procedure described in Section 3(b) above shall be as follows: during a regular measurement period that The Post selects in its discretion (for example, six or 12 months), there shall be a review of the service hours (as defined in the ACA) of part-time employees during the designated measurement period, after which part-time employees will be notified of their eligibility for coverage under the Benefits Plan during the succeeding stability period that The Post selects in its discretion (e.g., six or 12 months), based on their service hours during the measurement period.

4.     Part-Time Employees Working 15 to 30 Hours

(a)     Part-time employees who average fifteen or more hours per week, but less than thirty hours per week, under the measurement procedure set forth in Section 3(c) above, shall be permitted to participate in the Benefits Plan in accordance with its terms. Part-time employees hired to fill regular, fixed part-time schedules of 22.5 hours or more each week, but less than 30 hours each week, shall be eligible to participate in the Benefits Plan, effective on the date of their hire, under the same terms and same percentage contribution share as part-time employees.

(b)     Such employees who choose to participate shall pay the same percentage contribution toward the premium costs of this benefit coverage that is paid by part-time exempt and managerial employees of The Post, as periodically adjusted by The Post in its discretion, both during the term of this Agreement and after its expiration. Any such employee who loses eligibility for benefits because of failure to pay the requisite percentage of the premium cost shall not be eligible to participate again in the Plan except to the extent otherwise required under the ACA (or any other federal or state insurance law or regulation).

(c)     Part-time employees who have been eligible and have chosen to participate in the Benefits Plan, and who cease to be eligible for the coverage under the terms defined in Section 4(a) above, may continue to be covered by the Benefits Plan, provided such employees shall pay 102% of the premium cost. The period for entitlement for coverage under this section shall be eighteen months.

5.     (a)     All full-time Guild-covered employees, and eligible part-time employees to the extent provided in Sections 3 and 4 above, shall be eligible to participate in the health and hospitalization insurance program, the employee life insurance program, the dependent life insurance program, the long-term disability

50

insurance program, the pre-tax dependent care program, the same-sex domestic partner benefit program, the Healthy Premium and/or other wellness or health incentive programs, and adoption assistance program applicable to exempt and managerial employees of The Washington Post generally, in accordance with the terms of such programs as they may from time to time be modified by the Publisher. During the term of this Agreement and after its expiration, these plans are subject to change at the same time and in the same manner as for exempt and managerial employees, and such changes shall not be subject to arbitration or bargaining.

(b)   During the term of this Agreement and after its expiration, the Publisher shall have the right to make plan design changes, changes in employees' percentage contributions, changes in connection with the Affordable Care Act (or any successor federal or state insurance statute or regulation), including changes to the measurement and stability periods for part-time employees and changes to avoid or offset ACA penalties and taxes (or penalties or taxes imposed by any other federal or state laws or regulations), and changes in the benefits offered under the Benefits Plan, including changes in coverage, deductibles, incentives, surcharges and co-payments, at the same time and in the same manner as for exempt and managerial employees, and such changes shall not be subject to arbitration or bargaining.   However, before any substantial change is made by the Publisher in the benefits or contributions described in this Article, The Post will meet and confer with the Guild as to such changes. In addition the parties may establish a joint committee to examine questions concerning health care benefits and insurance costs and to make recommendations to the Publisher.

(c)   Nothing in this Article precludes either party from seeking to renegotiate, during bargaining for a successor collective bargaining agreement, the terms and conditions of Guild-covered employees' participation in the plans described in this Article to be effective under a successor agreement.

6.   The Publisher reserves the right to terminate the coverage of any employee who fails to contribute the employee's portion of the premium or who enrolls ineligible dependents in the plan.   Coverage may be terminated as of the first day of the month following the month in which the employee failed to make such contribution, provided the Publisher furnishes written notice to the employee beforehand to give the employee the opportunity to make up the payment due. If an employee is absent from work on an approved leave of absence for a period of six months or

51

more, then the Publisher shall not be required to make the Publisher's percentage contribution on behalf of such employee after such six-month period, provided that The Post shall furnish written notice to the employee of discontinuance of paying its portion of the premium in sufficient time to enable the employee to arrange to pay the premium without loss in coverage. The Post shall honor any agreement between it and an employee for a longer period of coverage during the employee's absence from work.

## ARTICLE XXIII - GRIEVANCE PROCEDURE

1.  The Grievance Committee shall generally consist of three representatives of the Publisher who shall be selected by the Publisher, and three representatives of the Guild who shall be selected by the Guild. In addition to these representatives, each party shall have the right to have a reasonable number of other involved representatives or witnesses relevant to the dispute, including the grievant, attend the grievance meeting.

2.  Step One -- Department Level: Whenever there is a disagreement involving an alleged violation of a specific provision of this Agreement, including a controversy over any form of discipline, the aggrieved party shall address the other party in writing (addressed to The Post's Labor Relations Department or the Guild's Administrative Officer or staff, as the case may be), within ten working days from the date that the grievant (The Post, the Guild or an employee, as the case may be) or its representatives knew or should have known of the event giving rise to the grievance, stating in full the grievance and the relevant provision(s) of the contract alleged to have been violated, and the nature of the relief sought. The Guild and The Post may discuss the grievance at the department level, but shall not be obligated to do so.

3.  Step Two -- Grievance Committee: Within ten working days of the filing of a grievance in accordance with Section 2 above, the grieving party may refer the grievance to the Grievance Committee. When a controversy is referred to the Grievance Committee by the grieving party in writing, the Committee shall convene within twenty working days to hear both parties or their representatives. The responding party will provide a written answer to the grievance within ten working days from the date of the meeting, however, failure to meet this time period shall not be deemed a waiver under Section 5 of this Article.

4.  Step Three -- Arbitration:

    (a) If no decision is reached at the Grievance Committee meeting, the grieving party may, within fifteen working days of the Committee's

52

meeting, serve a written demand for arbitration (by a single arbitrator) on the other party. The grieving party's demand for arbitration shall be addressed to the other party in writing, citing the specific issues(s) and provision(s) of the Agreement to be arbitrated.

(b) Upon receipt of a timely written demand for arbitration, The Post and the Guild will select an arbitrator. If the parties cannot select an arbitrator within ten working days by individual designation, an arbitrator will be selected within the next ten working days by alternately striking names from a standing panel of five arbitrators selected by the parties, with The Post and the Guild alternately striking the first name in each case. At the request of either party, an arbitrator not selected for a pending arbitration shall be removed from the panel, after which the parties shall meet within thirty days to select another arbitrator for the panel.

(c) The arbitration hearing shall be conducted according to the Voluntary Labor Arbitration Rules of the American Arbitration Association; however, the AAA shall have no authority as to the conduct of the hearing or the arbitration unless otherwise agreed to by the parties. The decision of the arbitrator shall be final and binding, it being understood and agreed, however, that neither party waives any legal rights it may have. The arbitrator shall have the authority to rule on either party's motions, including pre-hearing dispositive motions. The arbitrator shall not have the authority to amend or modify, add to or subtract from the provisions of this Agreement. Matters left unrestricted by a specific provision in this Agreement, and matters left to the discretion of the Publisher throughout this Agreement, shall not be subject to arbitration.

(d) If a discharged employee is reinstated, wages for time lost as a result of the discharge and accrued contract benefits shall be considered and decided by the arbitrator, but in no event shall such wages or benefits exceed those that the employee would have received but for his or her discharge, or accrued benefits exceed those set forth in this Agreement. Reprimands and disciplinary actions without loss of pay shall be subject to the grievance procedure but shall not be arbitrable.

(e) Matters affecting relations between employees and The Post may be discussed by Guild and Post representatives, however such subjects shall not be subject to arbitration.

5. The time periods set forth in this Section may be extended by mutual consent, but, unless such a period is extended in writing, failure to file or process a grievance, or failure to move a grievance to arbitration within

53

such time period, shall constitute a waiver of the right to do so. The term "working days" as used in this Section does not include Saturdays, Sundays, or holidays. If either party raises a question of arbitrability as to a grievance, such party shall be entitled to a separate, initial hearing before a separate arbitrator on arbitrability only, unless the parties agree otherwise, and a subsequent arbitration on the merits shall not be held unless the grievance is found arbitrable; provided, however, that neither party shall be deemed to have waived its right to have a court decide the issue of arbitrability instead of an arbitrator. All jointly incurred costs of arbitration shall be shared equally by the parties to this Agreement, except that neither party shall be responsible for the cancellation or postponement fees incurred by the other party's late cancellation or postponement of an arbitration.

6.    During the term of this Agreement or any extension thereof, the grievance and arbitration procedures of the Agreement shall be the sole and exclusive means of settling any and all alleged violations of any specific provision of the Agreement, except as otherwise provided in the Agreement. While the parties favor arbitration of all disputes concerning this Agreement and the employees covered by this Agreement, this Section shall not be deemed to preclude either party or any employee from exercising their respective rights to seek judicial or administrative relief concerning equal employment opportunity, occupational safety and health, the Fair Labor Standards Act, the National Labor Relations Act or other laws governing employment relations or employment. Accordingly, the Publisher shall not engage in any lockout, nor shall either the Guild or any employees covered by this Agreement engage in any strike or sympathy strike (other than a by-line strike), work stoppage, slowdown, concerted refusal to work or other interference with or stoppage of work; however, to the extent provided by law, Guild-covered employees may continue to engage in legally protected, concerted activities, e.g. signing a petition or distributing leaflets.

7.    It is understood and agreed that the Publisher shall have the sole right to determine the manner and means of operation and production, except as specifically limited by this Agreement.

8.    The Publisher and the Guild agree that there are no mutually acknowledged past practices, other than interpretative ones that are not inconsistent with or in conflict with any provision of this Agreement, which have any contractual or otherwise legally enforceable application between them. The Publisher may, in his or her discretion, establish, modify or rescind Post policies, standards of conduct and related procedures on topics such as sexual harassment, discrimination, electronic mail, and the like; provided that no employee covered by this Agreement shall be disciplined in connection with changes in past

54

practices, standards of conduct or procedures where the employee has not been given adequate notice of such changes.

9.  By agreement of The Post and the Guild, an arbitrator shall defer a hearing on the merits of an arbitration to permit the arbitrator to seek a resolution of the dispute presented for arbitration through alternative dispute resolution procedures agreed upon by the parties, e.g., mediation or fact-finding. In the event that the Guild files a demand for arbitration, in connection with which an allegation of discrimination is made, then, at the request of either party, the arbitrator selected to hear the arbitration will conduct preliminary proceedings in an expeditious manner for the purpose of voluntary resolution of the dispute through mediation, the results of which will be non-binding, and the record of which shall not be admissible as evidence in any subsequent arbitration on the merits.  In the event that the Guild or an employee elects to pursue a claim of discrimination in an administrative or judicial forum, all related grievances involving that employee's employment and/or separation from employment shall be held in abeyance pending completion of the administrative or judicial proceedings on such claim.

## ARTICLE XXIV – COMPUTERS AND WORK STATIONS

1.  The Post will continue to pay the reasonable cost of an annual opthalmological or optometric examination for employees who are regularly assigned to operate a computer or similar device. If an eye examination discloses the need for corrective lenses to operate a Post computer or similar device, The Post will reimburse the employee a designated amount for the cost of either corrective eye glasses, including standard frames, or contact lenses, consistent with The Post's policy on Reimbursement of Vision Care Costs for Computer Users.

2.  The Post has provided employees with employee-adjustable furniture, workstations and computers, as well as appropriate workstation accessories such as telephone headsets, wristrests, footrests and task lights.  The Post intends to continue to provide such items and to implement such rest breaks, training and other related measures as it may deem appropriate or as may be required by federal law.

## ARTICLE XXV - SAVINGS PLAN & SECURE RETIREMENT ACCOUNT

1.  The Post expects to continue to maintain the "Tax Deferral and Savings Plan No. 2" for Guild-covered Employees.

2. Administration of the Plan shall reside solely with The Post. In the event that future conditions, unanticipated and unforeseen, require termination of the Plan, The Post may do so, but not unless and until The Post terminates the existing Tax Deferral and Savings Plan for Exempt Employees or a successor plan to that one, and any other tax deferral and savings plan subsequently established or negotiated for any group of employees of The Post. If the Plan is terminated, employees on the active payroll as of the date of termination shall receive an immediate weekly salary increase in the same amount as the dollars previously diverted from the weekly scales effective with the payroll period next following the date of termination. The contract minimums, set forth in Article VI, shall be increased by the same amounts and on the same dates as described above, in the event of termination of the Plan. Employees not on the active payroll as of the date of termination by reason of being on an approved leave of absence, a phased retirement reduced work year, or like reasons, shall have their salaries increased, as set forth above, upon their return to the active payroll.

3. Employee contributions under the Plan will be transferred to the Plan trustee on a biweekly basis.

4. The Plan may be amended consistent with the terms of the plan and applicable law. For administrative convenience and in accordance with applicable law, The Post may combine the Tax Deferral and Savings Plan for Guild-covered employees with the Tax Deferral and Savings Plans for non-unit employees, without bargaining or arbitration with the Guild. Both during the term of this Agreement and after its expiration, the Publisher shall have the right to make plan design changes (e.g., loan options), to require automatic enrollment with an opt-out, to make changes in investment managers, and to make changes in investment options at the same time and in the same manner as for exempt and managerial employees, and such changes shall not be subject to arbitration or bargaining. The plan's design, including any loan options, and investment managers and investment options shall be no less favorable than those of the plan for exempt and managerial employees. The investment management fees of the Plan shall be paid by the Plan's participants and not by The Post.

5. The Post currently matches an eligible employee's contributions to the Plan of up to 1.0 percent of base pay, after the employee has worked for The Post for one year and has met the requirements for receiving a company match. Effective as soon as practical after the signing of this Agreement, The Post shall begin such matching contributions with the employee's initial participation in the Plan, rather than requiring one year of service; provided, however, that the employee shall become vested in such company matching contributions, and the earnings associated

56

with those contributions, after completing one year of service, as defined in the Tax Deferral and Savings Plan.

6. In connection with the change to a 1.0 percent match to eligible employees' Savings Plan accounts effective October 1, 2014, employees who had completed a Year of Eligibility Service were enrolled in the Secure Retirement Account ("SRA"), a schedule of the Cash Balance Program of the Pension Plan for The Washington Post and Companies (the "TWPC Plan"). Effective January 1, 2015, all new employees hired into the bargaining unit will be enrolled in the SRA after completing a Year of Eligibility Service. This SRA is subject to the terms and provisions of the TWPC Plan, including its amendment and termination provisions, and provides benefits to Guild-covered employees in accordance with the following benefit schedule for the term of this Agreement:

(a) For each calendar year in which an eligible employee qualifies to participate, the employee's SRA will be credited with "pay credits" that are a percentage of the employee's base pay multiplied by the Pay Credit Rate, which is based on years of participation earned in the first year of eligibility and after.

(b) Employees hired on or before August 31, 2009 shall receive the following Pay Credits:

| Years of SRA Participation | Pay Credit |
|---|---|
| | |
| Less than 5 | 4.40% |
| At least 5 but less than 10 | 5.40% |
| At least 10 but less than 20 | 6.20% |
| 20 or more | 7.00% |

(c) Employees hired on or after September 1, 2009 shall receive the following Annual Pay Credits:

| Years of SRA Participation | Pay Credit |
|---|---|
| | |
| Less than 5 | 2.20% |
| At least 5 but less than 10 | 2.70% |
| At least 10 but less than 20 | 3.10% |
| 20 or more | 3.50% |

(d) In addition, The Post will credit each eligible employee's SRA with interest credits for each quarter there is an account balance, as defined and determined under the TWPC Plan.

57

(e)     Employees become vested in the Secure Retirement Account after completing three years of vesting service, as defined in the TWPC Plan. Prior service will be counted for purposes of eligibility and vesting, but is not considered for the purposes of determining SRA Annual Pay Credits.

(f)     The SRA is incorporated into this Agreement and may be amended by the Publisher consistent with the terms of the Plans and applicable law, and such amendment shall not be subject to bargaining or arbitration with the Guild provided that any such amendment has no effect on the accrued or vested benefits of covered employees.   For administrative convenience or other legitimate business reasons, and in accordance with applicable law, The Post, in its sole discretion, may combine the SRA with other pension plans that it maintains for Post employees; spin off the SRA from the TWPC Plan; and/or make lump-sum payments from the SRA and provide benefits to retirees under the SRA; it being understood and agreed that such actions will not reduce the vested and accrued benefits, or negotiated benefit accruals of any active employees.

## ARTICLE XXVI - FULLY BARGAINED

The parties hereto agree that they have fully bargained with respect to wages, hours and other terms and conditions of employment, and have fully settled the same for the term of this Agreement. There shall be no modification or amendment of this Agreement during its term, except by mutual written agreement signed by both parties.

## ARTICLE XXVII - DURATION AND RENEWAL

1.  This Agreement shall be effective on July 13, 2018 and shall remain in effect through July 12, 2020.

2.  Questions of renewal or amendment of this Agreement are not subject to arbitration.

**The Washington Post**

**Washington-Baltimore News Guild Local 32035**

Jay Kennedy

Rick Ehrmann

Costa Bugg

David DeJesus

James Dean

Freddy Kunkle

Tracy Grant

Tom Jackman

Jennifer Legat

Pat Jacob

Patricia Dunn

Sara Mark

Blake Pulliam

Katie Mettler

Stephen Richardson

# **APPENDIX A**

Article 1, Section (1) provides that certain positions are excluded from the bargaining unit. These exclusions include managers, supervisors, confidential employees, and certain other employees. The Post and the Guild agree that the positions in such categories existing at the time of the execution of 2015-2017 the Agreement are the following:

**Department/Title**

**ADVERTISING**

Chief Revenue Officer

**ADVERTISING MARKETING**

Managers, Marketing
Manager, Product Management
Managers, Sales Planning
Marketing Product Manager
Senior Business Intelligence Analyst

**ADVERTISING OPERATIONS**

Director, Advertising Operations
Managers, Advertising Operations
Manager, Digital Technologies
Team Lead, Advertising
Traffic & Production Manager

**ADVERTISING SALES**

Vice President/GM Digital Ad Products & Strategy
Director, Sales
Classified Director - Sales, Marketplaces
Manager, Events Management
Sales Manager, Major Accounts

Senior Financial Analyst
Financial Analyst
Manager, Sales (C2C)

Manager, Sales (Consumer to Consumer)

Sales Manager, Major Accounts
RSU Director Sales, Regional

Sales Manager, Inner Market & Major Retail Accounts
Manager, Sales
Sales Manager, Preprint/FSI

Publisher, Targeted Products
Sales Manager, WPLive
Administrative Assistant

Sales Manager, Real Estate & Property Management

Sales Director, Mid-Atlantic Region

Director, National Retail
Sales Manager, National Retail

## ADVERTISING SYSTEMS

Senior Business Process Analyst

## CLIENT & CREATIVE SERVICES

Senior Director, Sales Operations
Yield Manager
Director, Digital Advertising Operations
Managers, Digital Account Management
Senior Ad Operations Account Manager
Director, Ad Innovations & Product Strategy
Director, Creative Services
Manager, Ad Innovations
Manager, Creative Design
Ad Innovations Managers
Ad Operations QA Specialists
Advertising Operations & QA Lead
Design Manager
Developers

Manager, Advertising Service
Supervisor, Sales Support

## EVENTS

Director, Advertising Promotions

Manager, Marketing
**EXPRESS**

General Manager, Express

**GLOBAL SALES**

Vice President, Global Sales
Ad Innovations Manager
Business Intelligence Analyst
Manager, Programmatic Advertising & Business Intelligence
New York Office Facilities Manager
Sales Manager
Sales Director, Eastern Sales
Sales Director, International & Central US
Sales Director, West Coast
Yield Managers, WP Plus

**SALES AND SERVICE ADMINISTRATION**

Director, Advertising Business & Technology Operations
Configuration Analyst

**MAGAZINE SALES AND ADMIN**
General Manager, Magazine
Manager, Advertising Operations

**<u>CIRCULATION</u>**

VP, Distribution and Customer Care
Administrative Assistant

Director, Circulation
Division Manager, Commercial Delivery
Division Managers, Home Delivery
Division Manager, Transportation
Managers, Transportation Operations
Assistant Manager, Commercial Delivery
Assistant Managers, Customer Service
Assistant Managers, Field Relations
Zone Manager, Regional Sales
Zone Managers
Senior Financial Analyst
Transportation Center Coordinators

## CIRCULATION GENERAL/OPERATIONS

Director, Circulation Operations
Manager, Customer Service Center
Manager, Data Administration
Manager, Education Sales &Services
Manager, Facilities Administration
Circulation Analysis & Reporting Manager

## CONSUMER MARKETING – ADMIN

Director, Consumer Marketing
Manager, Loyalty Programs
Manager, Subscriber Retention
Manager, Subscription Marketing
Consumer Promotion Manager
Associate Marketing Managers

## EDITORIAL

Editor, Editorial Page
Deputy Editor, Editorial Page
Section Administrator, Editorial
Associate Editors
Copy Chief Editorial
Digital Opinion Editor

## FINANCE

Vice President, Finance and Administration/CFO

## ACCOUNTING - TAX
Finance Director

## CIRCULATION ACCOUNTING

Supervisors, Finance

## FINANCE AND ADMIN PMO

Manager, PMO
Business Process Analyst

## FP&A

Finance Manager
Financial Modeling & Analysis Manager
Manager, Finance
Manager, Financial Modeling & Analytics
Newsroom Finance Manager
Senior Financial Analysts
Financial Analysts

**GENERAL LEDGER**

Director, Financial Accounting & Reporting Controller
Managers, Financial Accounting
Financial Analyst

**MAIL DESK**

Supervisor, Mail Desk

**NW SECURITY**

Director, Administration & Operational Services

**OFFICE OF CFO**

Director, Finance – Treasurer
Administrative Assistant

**OPERATIONAL RISK MANAGEMENT**

Financial Planning & Analysis Manager
Manager, Finance
Internal Control Manager

**PAYROLL DEPT.**

Manager, Payroll
Senior Payroll Specialist
Payroll Specialist

**REVENUE ADMINISTRATION**

Director, Financial Operations & Risk Management
Managers, Financial Operations & Revenue Accounting
Assistant Managers, Finance
Supervisors, Finance

**MARKETING**

Vice President, Audience Development & Analytics
Director, Digital Marketing
Digital Marketing Manager
Manager, Digital Analytics
Manager, Research & Analytics
Manager, Marketing
Manager, Advertising Sales Research

**NEWS**

**AUDIENCE DEVELOPMENT AND ENGAGEMENT**
Director, Digital Initiatives
Section Editors
Assignment Editors

**BOOK WORLD**

Deputy Section Editor

**CAPITAL BUSINESS**

Section Editor

**DIGITAL ADVERTISING INITIATIVES**

Assignment Editor

**DIGITAL DEVELOPMENT**

Director, Digital Products & Design
Director, Digital Strategy
Deputy Section Editor
Senior Designer

**ECONOMY AND BUSINESS**

Section Editor
Deputy Section Editor
Assignment Editors
Senior Producer

**FOOD**

Section Editor
Deputy Section Editor

**FOREIGN ADMINISTRATION**

Section Editor
Deputy Section Editor
Assignment Editors
Senior Producers

**HEALTH, SCIENCE AND ENVIRONMENT**

Deputy Section Editor
Assignment Editor

**INVESTIGATIVE**

Section Editor
Deputy Section Editor

**KIDS' PAGE**

Assignment Editor

**LOCAL LIVING**

Section Editor

**LOCAL POLITICS AND GOVERNMENT**

Section Editor
Deputy Section Editor
Assignment Editors
Associate Editor
Senior Producers

**MAGAZINE**

Section Editor
Deputy Section Editor
Assignment Editors
Chief Copy Editor

**MULTIPLATFORM DESK**

Section Editor
Deputy Section Editor
Chief Copy Editors

**NATIONAL ENTERPRISE**

Associate Editor

**NATIONAL POLITICS AND GOVERNMENT**

Section Editor
Deputy Section Editors
Section Administrator
Assignment Editors
Associate Editor
Senior Producer

**NATIONAL SECURITY**

Assignment Editors
Associate Editors

**NEWS CONTENT & RESEARCH**

Deputy Section Editor
Assignment Editors
Associate Editors

**NEWS LOGISTICS**

Manager, Technical Support
Systems Consultants

**NEWS NATIONAL TABLET**

Deputy Section Editors
Assignment Editors
Senior Designer

**NEWS OPERATIONS**

VP & Executive Editor
Director, Newsroom Operations

67

Section Editors
Deputy Managing Editors
Managing Editors
Administrative Services Manager
Executive Assistant

## OUTLOOK

Section Editor
Deputy Section Editor
Assignment Editor
Associate Editor

## POLITICAL VIDEO

Technical Director
Section Editor
Assignment Editors
Senior Developer
Senior Producers
Developer

## POLLING

Manager, Polling

## PRESENTATION

Section Editor
Deputy Section Editors
Deputy News Editor
Assignment Editors
Senior Graphics Editors
Senior Photo Editors
Senior Designers

## REAL ESTATE

Assignment Editor

## SPORTS MAIN
Section Editors
Deputy Section Editor
Assignment Editors
Chief Copy Editor

68

**STYLE**
Section Editor
Deputy Section Editor
Assignment Editors

**TRAVEL**

Deputy Section Editor

**UNIVERSAL DESK**

Deputy Section Editors
Assignment Editors
Chief Topics Editor
Home Page Editors

**WEEKEND**

Section Editor
Deputy Section Editor
Assignment Editor

**PUBLIC RELATIONS**

Vice President, Communications
Public Relations Managers

July 13, 2018

Rick Ehrmann
Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Rick:

In connection with the parties' discussions of Article XXV (Savings Plan & Secure Retirement Account) of the Agreement, this letter confirms that if, during the term of this Agreement, The Post increases the company matching percentage for exempt employees in the 401(k) Plan, The Post will provide Guild-covered employees with the same increased company match at the same time and under the same conditions as provided to exempt employees.

Sincerely,

Jay Kennedy

70

July 13, 2018

Rick Ehrmann
Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Rick:

This letter confirms that, in accordance with Article VII of the Agreement, the company and the Guild have agreed that Producers are exempt from overtime under the provisions of this Agreement. During the term of this Agreement, however, the company will continue to pay overtime (in accordance with the terms of Article VII), to those Producers on the payroll through the day before the expiration date of this contract, with a weekly salary less than $1,352/week, until such time that their salaries exceed this amount.

Sincerely,

Jay Kennedy

71

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Rick:

  In connection with the increases in the contractual minimum salaries for Class A
Circulation Drivers, this letter confirms that all Class A Circulation Drivers on the payroll at the
time of signing will receive a wage increase of $0.60/per hour, effective the first payroll period
after the date of contract signing.  This shall be the only payment that Class A Circulation
Drivers receive at signing; Class A Circulation Drivers will not be eligible to receive the wage
increase referenced in Article VI(7)(a).

Sincerely,

John B. Kennedy

AGREED:

Rick Ehrmann

72

July 13, 2018

Rick Ehrmann
Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Rick:

     This letter confirms that, in discussions at the bargaining table, the company and the Guild agree that the Associate Editor position is granted in special circumstances and will be limited to individuals making a transition from senior management.

Sincerely,

Jay Kennedy

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Mr. Ehrmann:

In negotiations leading to the Collective Bargaining Agreement dated June 11, 2015, the Guild and The Post engaged in a thorough discussion of The Post's Performance Management Program and its related appraisal process. It is the understanding of the parties that the process currently includes, among others, the following expectations for Post Managers and Editors who appraise employees:

1. Managers will involve employees in the process of setting clear performance expectations.

2. Throughout the year, performance goals will be tracked through formal and informal check-in meetings, ongoing feedback, coaching, collection of accurate performance data and employee involvement.

3. If managers determine that an employee did not meet expectations, they will consider whether it was due to circumstances outside of the employee's control.

4. After rating employees on each goal and competency, managers will include evidence in the comment sections of the review to back up the ratings.

5. During the annual appraisal meeting, employees will be allowed to offer their opinions first on the goals and competencies being reviewed. Managers will then offer their ratings and provide employees insight into their thought process. In the event a manager's rating is different than the employee's, the manager will consider why. If the manager chooses not to change the rating, they will explain why.

6. In the appraisal meeting, the manager will compare actual results with standards and will base the appraisal on relevant, accurate, and sufficient information. Managers will be honest and open to employee input. They will give employees feedback about improvement and performance needs.

This is a representative list of current best practices only. Nothing in this letter precludes The Post from making changes to its performance review process, without arbitration or bargaining with the Guild. The failure of any Post manager, supervisor or editor to follow these guidelines shall not in any way invalidate an employee performance review or evaluation, or

74

make an employee performance review or evaluation subject to arbitration under this Agreement. Any disputes between The Post and the Guild over this Side Letter will not be arbitrable. In the event a performance review is introduced in a disciplinary arbitration, nothing herein shall prevent the Guild from offering evidence of, or making arguments related to, non-compliance with the expectations listed above.

Sincerely,

John B. Kennedy

AGREED:

Rick Ehrmann

75

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C.  20005

Dear Mr. Ehrmann:

        In connection with incentives for its advertising sales staff, The Post will continue to
make available to individual employees the revenue numbers used to calculate their individual
incentive payments, in advance of those payments.  In the event that an incentive-eligible
employee does not routinely receive such information, the employee may request such
information from his/her manager or from The Post's Advertising Budget, Administration and
Systems Department, which will provide it promptly.

        This letter memorializes The Post's continued commitment to make such incentive
information available to employees.  The parties agree, however, that the commitments in this
letter are not subject to grievances and arbitration, but may be raised and discussed in the labor-
management committee meeting forum set forth in Article XIX.

                            Sincerely,

                            John B. Kennedy

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

                Re:    Collective Bargaining Data

Dear Rick:

       This letter confirms our understanding that The Post will continue to provide the Guild
with the non-name linked salary data identified in the 1989 Settlement Agreement outside the
time periods referenced in the 1989 Settlement Agreement when the Guild makes a reasonable
request for such data (e.g., because of contract pay increases), but not more frequently than once
a year. The Post will provide this data in electronic form provided that the Guild provides The
Post with appropriate written assurances that the Guild will take all necessary steps to maintain
the confidentiality of this electronic data, and prevent any unauthorized dissemination, viewing
or retrieval of this data.

       Nothing in this letter shall be deemed to modify or amend the 1989 Settlement
Agreement, and any data provided under this letter shall be subject to the limitations and
restrictions set forth in the 1989 Settlement Agreement.

Sincerely,

John B. Kennedy

AGREED:

Rick Ehrmann

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild,
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Re: Union Security (Article IV)

Dear Rick:

This letter confirms our agreement in connection with Article IV of the 2018-2020
Agreement. Up to a total of 10 employees each year will be permitted to resign from
membership in the Guild, upon request, outside the annual window periods in the Agreement.

Sincerely,

John B. Kennedy

AGREED:

Rick Ehrmann

78

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Rick:

This letter confirms that The Post and the Guild agree that the Zone Advertising
Representatives and the Prospecting Sales Associates may work in any unit of the Advertising
Department.

Sincerely,

John B. Kennedy

AGREED:

Rick Ehrmann

79

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Mr. Ehrmann:

     This letter confirms that, in connection with the Community Journalist Classification, The Post will operate with no more than twenty Community Journalists during the term of this Agreement.

Sincerely,

John B. Kennedy

AGREED:

Rick Ehrmann

July 13, 2018

Mr. Rick Ehrmann, Local Representative
Washington-Baltimore Newspaper Guild
Local 32035
1225 Eye Street, N.W., Suite 300
Washington, D.C. 20005

Dear Rick:

During negotiations leading to the Collective Bargaining Agreement dated November 8, 2013, the Guild and the Publisher discussed Article X, Section 3, of the Agreement, specifically that portion related to progressive discipline. Despite previous conflicts over the intent and interpretation of that language, the parties concluded their discussions with an agreement on the original meaning of the provision.

The Publisher, in a July 3, 2013 employee bulletin, described its view of how the progressive discipline provision was intended to operate. Here is that description:

"If The Post takes specified disciplinary steps (outlined in Article X, Section 3), an arbitrator has to "deem" progressive discipline satisfied and cannot find that The Post failed to engage in enough progressive discipline. Importantly, the parties simultaneously agreed that nothing in the agreed language limited "the Guild's right to challenge . . . disciplinary action on the basis that it was taken without just cause,' and nothing limited 'the Publisher's right to discipline, suspend or discharge for just cause.' In other words, The Post retained the right to take disciplinary action for just cause, with or without interim steps, but in those cases (lacking such specified interim steps), the Guild could claim, and an arbitrator could find, that The Post had not provided enough progressive discipline."

The Guild agrees with that description of how this progressive discipline provision was and is intended to operate.

In addition, during negotiations, the Guild and the Publisher discussed the NLRB's decision in Alan Ritchey in December 2012; given the negotiated grievance and arbitration provision of the Agreement, the parties agrees that the Ritchey decision does not apply.

Sincerely,

John B. Kennedy

AGREED:

Rick Ehrmann

81