# EXHIBIT 1(b)

## MEMORANDUM OF AGREEMENT

### between

### THE WASHINGTON POST AND
### WASHINGTON-BALTIMORE NEWS GUILD LOCAL NO. 32035

This Memorandum of Agreement, by and between The Washington Post, hereinafter referred to as "the Publisher" or "The Post" and the Washington-Baltimore News Guild, Local No. 32035, The News Guild – Communications Workers of America, hereinafter referred to as "the Guild" amends the July 13, 2018 Collective Bargaining Agreement between The Post and the Guild ("Contract") and extends the term of the Contract from April 30, 2021 to June 30, 2022, as described in this Memorandum of Agreement ("MOA").

The parties hereto agree as follows:

1.  The Post and the Guild agree that this MOA amends Article XXVII(1) of the Contract by substituting "June 30, 2022" for "April 30, 2021," thereby extending the term of the Contract from April 30, 2021 to June 30, 2022, with no other changes to the terms and conditions of the Contract, except as specifically referenced in Paragraphs 2 and 3 of this MOA.

2.  The Post and the Guild agree to amend Article VI (Minimum Salaries) by adding new paragraph 7(d) that will provide full-time and part-time employees who are on the active payroll of The Post and covered by this Agreement a flat increase of $15.00 in weekly salary (or $0.40 in hourly salary if part-time), which increase will be effective the beginning of the first payroll period following 36 months from the July 13, 2018 date of signing of the Contract.

3.  The Post and the Guild also agree to amend the following articles of the Contract, as reflected in the attached tentative agreements: Article XII (Vacations); Article XIII (Leaves of Absence); Article XIV (Severance Pay); and Article XXII (Health and Welfare).

4.  This MOA does not limit or prejudice either The Post or the Guild with respect to any proposals that either party may make during future collective bargaining negotiations.

5.  This MOA will become effective upon ratification of its terms by the Guild and its members.

IN WITNESS WHEREOF the parties hereto have set their hands and seals this 28th day of April, 2021.

**The Washington Post**

_(signature)_

John B. Kennedy

**Washington-Baltimore**
**News Guild Local No. 32035**

_(signature)_

Cet Parks

```
TENTATIVE AGREEMENT
Date: March 25, 2021
Time:
```

# ARTICLE VI - MINIMUM SALARIES

1.   The following minimum salaries shall apply to employees in Guild-covered positions.

<u>Editorial and News Departments:</u>

2.   The weekly salaries of employees in the following classifications shall be not less than the amounts specified.

Copy Aides

$525.81

Administrative & Editorial Aides

$634.75

Community Journalists            $739.03

Assistant Librarians & Researchers

$870.83

Librarian

$1077.43

News Aides

$584.72

News Interns

$929.58

Photo Technicians, Video Technicians

$670.65

Producers

$925.38

Editorial Writers,

| | |
|---|---|
| Reporters, Photographers, Columnists, Critics, Information Designers, Digital Photo Editors, Digital Video Editors, Video Journalists | $1,077.43 |
| Editors(1) | $1,237.06 |
| Editors(2) | $1,183.86 |
| Editors (3) | $1,130.62 |

3. (a) News employees who are covered by this Agreement and employed as Assistant Foreign Editors, Assistant Editors/Layout, and Multi-Platform Editors (Editors (2) for purposes of the minimums above) shall receive a salary that is not less than 10% above the minimum reporter scale for their experience in such position.

(b) News employees who are covered by this Agreement and who are employed as Assistant System Editors (Editors (3) for purposes of the minimums above) shall receive a salary that is not less than 5% above the minimum reporter scale for their experience in such position.

(c) All other News employees who are covered by this Agreement and employed as non-supervisory Editors, Assistant Editors, Art Directors, Graphics Editors/Planners, or other specialized non-supervisory Editor positions (Editors (1) for purposes of the minimums above) shall be paid a salary that is not less than 15% above the minimum reporter scale for their experience in such position.

(d) Part-time employees and full-time employees occupying the positions in this Section 3 for less than a week shall be paid a pro-rata amount as set forth

above based on their experience and time worked in such position.

<u>Commercial Departments</u>

4.  The weekly salaries of employees in the following classifications shall not be less than the amounts specified.

Staff Associates
$562.28

General Staff Associates
$587.01

Circulation Drivers
$618.75

Centrex Operators
$587.01

Secretaries (other than Confidential Secretaries)
$607.67

Advertising Services Staff Associate
$593.84

Senior Staff Associate
$634.85

Administrative Staff Associate
$710.33

Class A Circulation Drivers
$768.75

Principal Staff Associate, Digital Ad Ops Account Manager, Digital Ad Ops Contract Manager, Product Specialist, Product Analyst
$754.70

Classified Telephone
Sales
                    $748.32

Classified
Inside/Outside Sales
                    $849.41

Advertising Sales/Outside,
Artists, Copy, Layout,
Adv. Make-up, Education
Sales Representatives;
Digital Sales
Representatives; Sales
Planners
                    $1,077.43

Acquisition Sales
Executive/Commissioned;
Major Accounts Team Sales
Associate
                    $897.26

T-2 Computer
Operator
                    $632.04

T-3 Senior
Computer Operator
                    $695.33

T-4 Data Processing
Programmers
                    $787.85

Desktop Publishing
Associates
                    $956.96

Zone Advertising
Representatives,
Prospecting Sales
Associates

                    $588.80

5.    (a)    Any employee who in the course of his or her regular work performs duties which fall within more than one classification shall be given that classification which occupies more than fifty percent of his or her time.

(b)   In the event The Post creates a new or substantially new position within the bargaining unit, as the Publisher in his sole discretion may decide, and the duties of the new or substantially new position substantially differ from those of any existing classification for which a salary scale has been established, The Post agrees to notify the Guild at least ten working days before assigning the classification and salary scale, whether new or existing, to the new or substantially new position.   Upon the Guild's request, The Post will negotiate with the Guild the appropriate classification and salary scale for the new or substantially new position for a period not to exceed the ten working days notice period (unless extended by mutual agreement), but the decision to assign a classification and salary scale shall not be subject to arbitration.   If, at the end of negotiations, there is no agreement as to the classification and salary scale, the Publisher may nevertheless implement such classification and salary scale.

6.   Commission-Only Sales Representatives.  The Post shall have the right to create Guild-covered commission-only sales representative positions and to determine, in its discretion, the structure and amounts of their commission payments, the products that they sell, and the areas in which they operate.  Prior to creating this position, The Post will meet and confer with the Guild to discuss the commission-only sales representative position.  Employees in these positions will not earn a base salary, will not be eligible for any General Increase under Section 7, below, are not subject to the overtime requirements of the FLSA, and will be treated as fully-experienced Outside Advertising Sales Representatives for health insurance, vacation, sick leave, pension and other contractual benefits.  No Post employee shall be transferred involuntarily to a commission-only sales representative position.   The Post will operate with no more than 20 commission-only sales representatives during the term of this Agreement.

7.   General Increase.

(a)   Effective the beginning of the first payroll period following the date of signing of this Agreement, full-time and part-time employees covered by this Agreement who are on the active payroll of The Post at that date and covered by this Agreement, shall receive a flat increase of $15.00 in weekly or $0.40 in hourly salary if part-time.  Such increases shall be added to the minimum contractual rates set forth in Sections 2 and 4 above.

(b)   Effective the beginning of the first payroll period following 12 months from the date of signing of this Agreement, full-time and part-time employees covered by this Agreement who are on the active payroll of The Post at that date and covered by this Agreement, shall receive a flat increase of $15.00 in weekly or $0.40 in hourly salary if part-time. Such increases shall be added to the minimum contractual rates set forth in Sections 2 and 4 above.

(c)   Effective the beginning of the first payroll period following 24 months from the July 13, 2018 date of signing of this Agreement, which falls in July 2020, full-time and part-time employees covered by this Agreement who are on the active payroll of The Post at that date and covered by this Agreement, shall receive a flat increase of $15.00 in weekly or $0.40 in hourly salary if part-time. Such increases shall be added to the minimum contractual rates set forth in Sections 2 and 4 above.

**(d)   Effective the beginning of the first payroll period following 36 months from the July 13, 2018 date of signing of this Agreement, full-time and part-time employees covered by this Agreement who are on the active payroll of The Post at that date and covered by this Agreement, shall receive a flat increase of $15.00 in weekly or $0.40 in hourly salary if part-time. Such increases shall be added to the minimum contractual rates set forth in Sections 2 and 4 above.**

**(e)**(d) The Publisher's agreement to pay the increases set forth in this Agreement does not obligate the Publisher to continue making increases after expiration of the Agreement, and the Guild waives any right to contend that the Publisher is obligated to continue increases after contract expiration, as part of the status quo, prior to the execution of any successor contract requiring such payments.

8.   Night Differential.

For each shift worked that begins between 2:00 p.m. and 9:59 p.m., inclusive, the employee shall receive in addition to salary, the sum of $6.00; for each shift worked that begins between 10:00 p.m. and 5:59 a.m., inclusive, the employee shall receive in addition to salary, the sum of $7.50.

9.    Part-time.

    (a)    Part-time employees, including those who were not in the bargaining unit by virtue of their working an average of less than fifteen hours per week, according to the formula set forth in Subsection (b) below, shall be paid at a rate that is not less proportionally than the minimum salary scale or rate provided for the employees' positions and experience.

        A part-time employee who is covered by this Agreement is one who satisfies the continuity requirements set forth in Subsection (b) below.   A covered part-time employee will receive, on a pro rata basis, the holiday benefits provided under Article VIII [using the employee's regular schedule, or, if there is no regular schedule, using the average number of hours worked during the five weeks immediately preceding the holiday week as a basis], the vacation benefits provided under Article XII, the sick leave benefits provided under Article XI, the funeral leave benefits provided in Section 7 of Article XIII, the jury duty benefits provided in Section 10 of Article XVII, the parental leave benefits provided in Article XIII, Sections 4(a) and (b), respectively, and the severance benefits provided under Article XIV.  In the event that the Publisher, in his or her discretion, extends the Matching Gift Contributions program to exempt part-time employees, the Publisher shall permit Guild-covered part-time employees to participate in such program at the same time and on the same terms.

        Covered employees shall accrue vacation and sick leave credits for all weeks in which they qualify, according to Subsection (b) below up to a maximum of thirty-seven and one-half hours worked in any covered week.

        Covered part-time employees are also covered by Section 12 below and by Article IV, Union Security, Article V, Dues Check Off, Article X, Job Security, and Article XXI, Health and Welfare, of this Agreement.

    (b)    Every six months there shall be a review of the record of all hours worked by part-time employees for the 26 preceding weeks.  Part-time employees who averaged fifteen or more hours per week during the 26-week preceding period shall qualify for the benefits set forth in Subsection (a) above for the succeeding 26-week period.  Employees who do not satisfy this formula shall not be entitled to said benefits

during the succeeding 26-week period–except that all hours worked shall be counted toward accrual of–severance pay benefits.  The Post will communicate on its electronic sites to part-time employees and in writing to the Guild, on an annual basis, the accounting periods that it will use to determine continuity requirements.

10.  Salary Reductions.

No employee shall have his or her regular weekly salary including merit increases reduced without good cause.

11.  Vacancies in Higher Classifications.

When seeking to fill vacancies in existing or newly created staff positions covered by this Agreement, The Post shall post notices of such vacancy, and coincident with such posting, The Post may advertise for filling any such vacancy.  Copies of postings will be furnished to the Guild by the Labor Relations Department, either electronically or in hard copy, on a regular basis.  The Post will continue to make job postings available electronically to employees.  In the filling of such vacancies, The Post will, whenever practicable, give first consideration to current employees and thereafter to temporary or replacement employees then on the payroll, but the decision as to which applicant to select shall be in the sole discretion of The Post.  For good cause, The Post may determine that the posting of a vacancy is inappropriate, e.g. where the vacancy will not be filled, where a candidate for a position has special qualifications related to the vacant position, or where other exceptional circumstances exist. However, it may be appropriate to post a vacancy even when a strong candidate exists, with this fact noted on the posting.  It may also be appropriate to limit certain postings to a single department.  In each such instance where The Post decides not to post a vacancy, it will so notify the Guild. Disputes concerning this Section shall be subject to the grievance procedure, but shall not be arbitrable under Article XXII.

12.  (a)     When an employee accepts a promotion to a position in a higher classification, he/she shall have a tryout period for the same time as for the probationary period provided under Article X and he/she shall be paid at the beginner's rate for the higher classification, but not less than his/her previous rate. The Post shall notify the employee in writing after his/her promotion to a position in a higher classification, whether his/her performance is satisfactory or unsatisfactory with all of the factors involved in making this

determination. A copy of each satisfactory or unsatisfactory notice, which shall be given in accordance with the time periods provided under Article X, shall be sent to the Guild.

(b)  An employee moved from a lower to a higher classification shall earn no less than the minimum salary of that higher classification or, if higher, the employee's current rate of pay.

13.  The Post agrees that in the event an employee in a lower classification who applied to fill a vacancy in a higher classification, or an employee who applied to be transferred to a vacancy in the same classification, is not selected for such promotion or transfer, such employee shall be notified upon his/her request as to the reasons therefore, and shall be informed for his/her guidance as to whether he/she is considered likely to be found suitable for such promotion or transfer at a future date.

14.  If a general increase is granted while an employee is on a leave of absence as specified in Article XIII, such employee, upon return to work, will receive the amount of the general increase as if the employee had been on the active payroll at the time the increase was granted.

15.  During the term of this Agreement, and consistent with applicable laws, unit employees will be eligible to participate in the Commuter Benefits program, which allows The Post, upon the request of an employee, to deduct from the employee's biweekly paycheck, on a pre-tax basis, up to the maximum allowed by federal law, for out-of-pocket work-related parking and/or mass transit commuting expenses, pursuant to the rules of the Commuter Benefits program. The Post will meet and confer with the Guild, upon request, as to any changes to this program or its administration, but such changes shall not be subject to bargaining or arbitration.

> **TENTATIVE AGREEMENT**
> Date: March 11, 2021
> Time:

## ARTICLE XI - SICK LEAVE

1.  Employees covered by this Agreement shall earn, in each twelve-month period during their first twenty years of employment, up to fifteen days of sick leave.  Such sick leave shall be accrued on an hourly basis, based on straight-time hours worked or paid up to a maximum of thirty-seven-and-one-half hours in a workweek, and such sick leave shall be used for bona fide illnesses, unless clearly arising from the employee's own misconduct.  For the purpose of this paragraph, absence during working hours due to emergency sickness, psychiatric, medical or dental care, shall be considered a bona fide illness where it is not possible for the employee to schedule such emergency care during non-working hours.  Any such sick leave not exhausted by an employee during the twelve-month period to which it relates may, in case of bona fide illness not arising from his or her own misconduct, be accumulated to a maximum accumulation of one hundred thirty-five days. Additional sick leave may be granted at the discretion of The Post.  Sick leave under this Section shall be construed to include sick leave due to the illness of a dependent child up to age 18 or a disabled child regardless of age. An employee may also use up to 120 hours of accrued sick leave while on approved FMLA leave due to the serious health condition of a covered person other than the employee or dependent child as provided above.  The Post may in any case require an employee to submit a certificate of a reputable physician, or may have him/her examined by a physician of its own selection, in order to determine whether such employee is entitled to sick leave hereunder.  In case of the illness of a dependent child as provided above, The Post may require the employee to submit a certificate of a reputable physician.  Sick leave may also be used for absences covered by the District of Columbia's Accrued Sick and Safe Leave Act.

2.  After twenty years of continuous Post employment, employees will be offered a one-time option of either (a) continuing to earn up to fifteen days of sick leave as provided in paragraph (1) above, or (b) beginning to earn twelve sick leave days each year, three of which may be used as personal leave days; in extraordinary circumstances, an employee may request to change this election, which the Publisher may grant or deny in its discretion.  These

personal leave days may be used for absences due to the illness of the employee or the employee's dependent child up to age eighteen, or for a personal reason.  In the event that an employee wishes to take two or more consecutive work days off for a personal reason, such days shall be scheduled in advance with the employee's supervisor, who will not unreasonably refuse permission for the use of such accumulated personal leave.  If an employee does not use all of his or her personal leave days in the one-year period during which they were accrued, the unused personal days shall convert automatically to sick leave days, which the employee may accumulate up to the one hundred thirty-five day maximum in Section 1.

3.    An employee may not take sick leave during an absence for which the employee is eligible to receive Worker's Compensation benefits.

4.    Each employee's sick leave balance shall be available to employees in The Post's password-protected system providing electronic confirmation of employee pay.

5.    This Agreement waives any requirements of the District of Columbia's Accrued Sick and Safe Leave Act that are inconsistent with the terms and conditions of this Agreement.

6.    ~~If an eligible employee is entitled to paid medical leave benefits through the DC Paid Leave Law or any other federal, state or local law, the employee must apply for all available benefits. Any benefit that the employee is deemed eligible to receive (or would have been eligible had they applied) will run concurrently with and offset the employee's paid sick leave provided under this Article so that there is no duplication of benefits. If the benefits provided under the DC Paid Leave Law (or other state or local laws) are less than the paid leave under this Article, The Post will allow employees to supplement the state or locally funded benefit with The Post's sick leave pay, so that the combined benefits (from the state or locally funded benefit and from The Post) are equal to what the employee would have otherwise received under this Article.~~

**TENTATIVE AGREEMENT**
Date: March 11, 2021
Time:

## ARTICLE XII - VACATIONS

1.  For the purpose of this Article, "vacation" shall mean vacation with pay, and "employment" shall mean regular, full-time and covered part time, continuous employment at The Post.

2.  Employees shall earn vacation during each employment year in accordance with the following schedule:

    (a)  Employees who have completed twenty years or more of employment, 7.5 hours of vacation for each 88.50 hours paid at the straight-time rate up to a maximum of 165 hours (four weeks and 15 hours) a year.

    (b)  Employees who have completed four years or more of employment, 7.5 hours of vacation for each 97.50 hours paid at the straight-time rate up to a maximum of 150 hours (four weeks) a year.

    (c)  Employees who have completed less than four years of employment, 7.5 hours of vacation for each 130 hours paid at the straight-time rate up to a maximum of 112.50 hours (three weeks) a year.

3.  No employee shall be required to accept three weeks of the employee's vacation at any time except between May 1 and October 31.   No more than three weeks' vacation may be taken consecutively without the permission of The Post.  The Publisher, in his or her discretion, shall determine vacation schedules within each working unit, taking into account company-wide and departmental seniority, operational needs and other circumstances.  With the consent of an employee and The Post, a vacation may begin on any day of the week.   The Post will determine the number of employees to be on a vacation at any one time. Accrued vacation may be taken in increments of less than one week only with the prior approval of the supervisor. Employees are responsible for accurately reporting the number of vacation hours actually taken.

4.  If the vacation period of an employee embraces a holiday, as defined in Article VIII, the number of days chargeable as vacation for that period shall be one less than the number of days that would otherwise be chargeable.

5.  (a)  Employees' vacation balances shall not exceed the maximum amount of annual vacation credits that an employee can earn under Section 2 above at any time.  Notwithstanding the foregoing, any vacation credits unused as of **December 31** ~~an employee's annual leave accrual date~~ shall be automatically transferred into a "deferred vacation" account. Such deferred vacation must be used within the next twelve months, and any deferred vacation balance remaining at the end of such 12-month period will automatically be forfeited. The deferred vacation account cannot exceed the maximum amount of annual vacation credits that an employee can earn under Section 2 at any time.  When an employee takes vacation, vacation credits shall be deducted first from the deferred account and then, after the deferred vacation account is reduced to a zero balance, from the employee's current vacation accrual.  Employees' pay stubs will reflect the balances in their vacation accounts.

    (b)  Current employees who have deferred vacation credits in their deferred vacation account (which cannot exceed one year's worth of vacation) may elect voluntarily and anonymously to donate up to one-half of their deferred vacation credits to another employee if the receiving employee (a) is on an approved leave without pay under the federal Family and Medical Leave Act and/or the D.C. Family and Medical Leave Act; and (b) has exhausted all sick leave, vacation and other paid leave available to the employee under this Agreement, the DC Paid Leave Law, and other applicable state laws, in accordance with the vacation donation procedures established by the Publisher.

6.  When an employee resigns or is discharged or dies, the employee (or beneficiary in event of death) shall be paid for any accrued vacation which the employee has not taken.  Vacation shall accrue on an hourly basis from the beginning of the employee's latest year of employment. Employees shall not be allowed to take vacation not yet credited except in the Publisher's discretion.  Where upon resignation or discharge an employee has taken vacation not yet earned at the time of resignation or discharge, the amount in dollars of such unearned vacation shall be deducted from any

sums otherwise due the employee at the time of discharge or resignation.

7.    An employee on vacation who requires hospitalization during the employee's vacation period may request that the period of hospital confinement be considered sick leave.

8.    ~~During the term of this Agreement, the Publisher may move from the current leave accrual date vacation system to a calendar year vacation system for purposes of administering employee vacation. The Publisher agrees to meet and confer with the Guild prior to implementing such a change to the administration of employee vacation.~~

> **TENTATIVE AGREEMENT**
> Date: March 11, 2021
> Time:

# ARTICLE XIII - LEAVES OF ABSENCE

1.  By arrangement with The Post, and in the Publisher's sole discretion, employees may be granted leaves of absence consistent with staffing requirements.  An employee on leave of absence shall waive his/her right to reinstatement if he/she accepts other employment that conflicts with the interest of The Post, without the approval of The Post, or if the employee remains on leave for more than one year, without the approval of The Post (except as provided in Section 8, below).  Leaves for family or medical reasons shall be granted to the extent required by law.

2.  If an employee is elected or appointed to hold office in The Newspaper Guild or in the Washington-Baltimore Newspaper Guild, he/she shall, upon reasonable notice in writing, and operating conditions permitting, be given a leave or leaves of absence from The Post for a period or periods not exceeding two years; provided, that only one employee at any one time from a specific department, or an aggregate of three employees, at any one time, shall be entitled to such leave. Any such leave may be extended beyond such period by mutual agreement between The Post and the employee.

3.  An employee elected a delegate to a local or national meeting of either The Newspaper Guild, the Communications Workers of America, or the American Federation of Labor-Congress of Industrial Organizations shall, upon reasonable notice in writing to The Post, prior to the opening date of such meeting, and operating conditions permitting, be granted leave of absence for the duration of such meeting, provided that The Post shall not be required to grant to any employee more than thirty days' leave under this paragraph during any period of twelve consecutive months.  The number of employees who may be granted a leave under this paragraph shall be limited to three at any one time. The number may be increased for a particular meeting when mutually agreed upon by The Post and the Guild.

4.  (a)   Parental leave (after the birth or placement for adoption of a child) of up to six months shall be available upon request to full-time and part-time employees, beginning immediately

after the birth or placement for adoption of a child.  Notice of parental leave shall be in writing and, for the purpose of The Post's records, the supervisor shall acknowledge receipt of the notice in writing.   Work which may be performed at home may be offered to the employee and compensated at the daily straight-time rate, and any day's work at home shall not reduce or extend the period of leave.

(b)    A full-time or covered part-time employee is eligible for up to twenty (20) weeks of paid parental leave in accordance with the terms of The Post's Paid Parental Leave Policy. Such paid leave must be taken within six (6) months of the birth or adoption of the employee's child.

(c)    <u>Coordination with Family and Medical Leave Laws</u>

        i.    Parental leave under The Post's Policy must be taken concurrently with any leave under the Family and Medical Leave Act and any state or local family leave laws.

        ii.    If an eligible employee is entitled to paid family and medical leave benefits through the DC Paid Leave Law or any other federal, state or local law, the employee must apply for all available benefits. Any benefit that the employee is deemed eligible to receive (or would have been eligible had they applied) will run concurrently with and offset the employee's paid parental leave provided under this Article so that there is no duplication of benefits. If the benefits provided under the DC Paid Leave Law (or other state or local laws) are less than the paid leave under this Article, The Post will allow employees to supplement the state or locally funded benefit with The Post's parental leave pay, so that the combined benefits (from the state or locally funded benefit and from The Post) are equal to what the employee would have otherwise received under this Article. Applicable federal, state or local leave laws cannot be applied to extend the duration of paid parental leave under The Post's Policy beyond twenty (20) weeks.

5.    Leaves of absence under this Article shall not constitute breaks in continuity of service, however the time spent on such leaves shall not be considered service time.   Any full-time or part-time employee covered by this Agreement who enters into the Armed Forces of the United States or who serves as a military reservist or national guard member shall be afforded, at a minimum, the protections of the Uniformed Services Employment and

Reemployment Rights Act, and The Washington Post ~~Company~~'s Military Leave Policy applicable to all Post employees, which provides benefits in excess of federal law.

6.  When an employee is elected to an office of the Washington-Baltimore Newspaper Guild, or as a member of the Washington-Baltimore Newspaper Guild Executive Council or as a delegate to the Greater Washington Central Labor Council, the employee may request that the employee's regular time off under Article VII of this Agreement, coincide with the regular meetings of those organizations. The Post will grant such request where it is not in conflict with the operating requirements of the Company.

7.  Bereavement Leave.  When an employee covered by this Agreement has a death in the immediate family (defined as parents, spouse, brothers, sisters, children, mother and father of spouse, grandparents, stepmother, stepfather, domestic partner and their children (as defined in The Post's Employee Welfare Benefit Plan)), the employee shall, upon request, be granted a leave of absence for the purpose of attending the funeral, and the employee shall receive the scheduled work days off with pay that occur within either three days of the death or within a three-day period that includes the day of the funeral, provided the employee attends the funeral.

8.  If an employee is unable to work for a period of twelve months or more for any reason, the employee shall be deemed to have voluntarily resigned on the 366th consecutive calendar day of such absence, absent an agreement in writing between the employee and The Post to extend such period in appropriate circumstances. Before treating an employee on medical leave as having resigned under this provision, the Publisher will furnish written notice to the employee and offer the employee the opportunity to provide medical documentation verifying that he or she is unable to work, at least every three months, and establishing that the employee will be able to return to active employment within a reasonable period of time not to exceed 24 months from the employee's first date of extended absence. Nothing in this provision shall impair the right of the Publisher to terminate an employee for just cause at any time or to terminate an employee who fails to return to work after exhausting his/her leave entitlements under this Agreement or under federal or state laws.

9.  **Effective January 1, 2021, employees are permitted to take two days of personal leave each calendar year. Personal leave days shall be taken by December 31 each year, and do not**

carry over into the following calendar year.  Employees must schedule the use of these personal leave days with their supervisor and may only take these days with prior approval. Employees who leave the company will not receive payment for unused personal leave days.

<table>
<tr><td>

**TENTATIVE AGREEMENT**
Date: March 11, 2021
Time:

</td></tr>
</table>

# ARTICLE XIV - SEVERANCE PAY

1.      When an employee who has served The Post for more than six consecutive months in his or her latest period of employment is discharged for any reason with good and sufficient cause, other than willful neglect of duty, gross misconduct, layoff for economic reasons under Article X, or the Publisher's exercise of its Article II jurisdiction and work assignment rights, the employee shall be paid in addition to all other amounts due one week's salary for each twelve months, or major fraction of the employee's latest period of continuous employment, up to a maximum of fifteen (15) weeks of severance pay.  Severance pay shall be computed on a basis of highest weekly salary received by the employee during the two years next preceding the termination of the employee's service.

2.      When an employee who has served The Post for more than six consecutive months in his or her latest period of employment is laid off under Article X for economic reasons, the employee shall be paid, in addition to all other amounts due, three quarters of one week's salary for each six months, or major fraction of the employee's latest period of continuous employment, up to a maximum of thirty (30) weeks of severance pay.  Severance pay shall be computed on a basis of highest weekly salary received by the employee during the two years next preceding the termination of the employee's service.

3.      When an employee who has served The Post for more than six consecutive months in his or her latest period of employment is laid off under Article X as a result of the Publisher's exercise of its Article II jurisdiction and work assignment rights, including but not limited to, the Publisher's assignment or reassignment of work to employees not covered by this Agreement, or to employees of any other employer, the employee shall receive, at a minimum, the following notice and severance:

(a)     Forty-five days advance notice of layoff.

(b)     One week's salary for each six months, or major fraction of the employee's latest period of continuous employment, up to a maximum of forty-five (45) weeks of severance pay.  Severance pay shall be computed on a basis of highest weekly salary received by the

employee during the two years next preceding the termination of the employee's service.

(c)     For employees with less than ten years of service, six months of employer-paid COBRA premiums.  For employees with ten or more years of service, twelve months of employer-paid COBRA premiums.

(d)     The Post will arrange for employees to attend, on an optional basis, a seminar hosted by an outside vendor that might include career and job search counseling, and/or retirement financial management and planning.

4.     The payment of severance under this Article XIV is conditioned on the employee's signing a release of claims in a form typically used by The Post.  The enhanced severance under Section 3 shall not be available to an employee who is offered, but declines, both a window plan incentive under Article X(8) that includes benefits exceeding the enhanced severance under Section 3, and alternative employment with The Post in a comparable position in lieu of layoff.

5.     The Post may deduct from any severance payment hereunder any levy or tax thereon to which the employee is subject under Federal or State law.

6.     The Post (i) will apply the severance formulas and caps on layoff severance, contained in paragraphs 2 and 3(b) of Article XIV of the 2015-2017 Post-Guild Agreement, to any Guild-covered employees with 20 or more years of Post service as of the date of signing this Agreement (July 13, 2018), and who are laid off after the signing of this agreement through and including the date prior to contract expiration (**June 29, 2022** ~~July 11, 2020~~); and (ii) will provide the Guild-covered employees described in this paragraph 6(i)  with six months of paid COBRA if laid off under paragraph 2 of Article XIV during the time period described in paragraph 6(i) above.

<div style="border:1px solid">

**TENTATIVE AGREEMENT**
Date: March 11, 2021
Time:

</div>

## ARTICLE XXII - HEALTH AND WELFARE

1.   Full-time employees and eligible part-time employees, as set forth in Section 3 and 4 below, will continue to be eligible for coverage under The Washington Post Employee Welfare Benefit Plan (the "Benefits Plan"), in accordance with its terms. Administration of the Benefits Plan, including selection of the administrator and any insurers, shall reside solely in The Post's discretion and shall not be subject to arbitration or bargaining with the Guild during the term of this Agreement and after its expiration.

2.   During the term of this Agreement and after its expiration, full-time employees and eligible part-time employees, as set forth in Section 3 and 4 below, will pay the same percentage contribution toward the premium costs for this benefit coverage that is paid by exempt and managerial employees of The Post, as periodically adjusted by The Post in its discretion.

3.   Part-Time Employees Working 30 or More Hours.

   (a)   Consistent with the Patient Protection and Affordable Care Act as amended ("Affordable Care Act" of "ACA"), part-time employees hired to fill a regular part-time schedule of 30 hours or more a week will be treated as full-time employees under The Post's Benefits Plan and will be eligible to participate in such Benefits Plan on the same basis as full-time employees while they remain on a regular part-time schedule of 30 hours or more a week, subject expressly to the provisions set forth in this Article.

   (b)   Consistent with the ACA, part-time employees who are not described in Section 3(a), but who average 30 or more paid hours per week during the measurement period set forth in Section 3(c) below, will be treated as full-time employees under The Post's Benefits Plan and will be eligible to participate in such Benefits Plan on the same basis as full-time employees for the succeeding stability period set forth in Section 3(c) below, subject expressly to the provisions set forth in this Article.

(c)     The measurement procedure described in Section 3(b) above shall be as follows: during a regular measurement period that The Post selects in its discretion (for example, six or 12 months), there shall be a review of the service hours (as defined in the ACA) of part-time employees during the designated measurement period, after which part-time employees will be notified of their eligibility for coverage under the Benefits Plan during the succeeding stability period that The Post selects in its discretion (e.g., six or 12 months), based on their service hours during the measurement period.

4.     Part-Time Employees Working 15 to 30 Hours

(a)     Part-time employees who average fifteen or more hours per week, but less than thirty hours per week, under the measurement procedure set forth in Section 3(c) above, shall be permitted to          participate in the Benefits Plan in accordance with its terms.  Part-time employees hired to fill regular, fixed part-time schedules of 15 hours or more each week, but less than 30 hours each week, shall be eligible to participate in the Benefits Plan, effective on the date of their hire, under the same terms and same percentage contribution share as part-time employees.

(b)     Such employees who choose to participate shall pay the same percentage contribution toward the premium costs of this benefit coverage that is paid by part-time exempt and managerial employees of The Post, as periodically adjusted by The Post in its discretion, both during the term of this Agreement and after its expiration. Any such employee who loses eligibility for benefits because of failure to pay the requisite percentage of the premium cost shall not be eligible to participate again in the Plan except to the extent otherwise required under the ACA (or any other federal or state insurance law or regulation).

(c)     Part-time employees who have been eligible and have chosen to participate in the Benefits Plan, and who cease to be eligible for the coverage under the terms defined in Section 4(a) above, may continue to be covered by the Benefits Plan, provided such employees shall pay 102% of the premium cost.   The period for entitlement for coverage under this section shall be eighteen months.

5.   (a)   All full-time Guild-covered employees, and eligible part-time employees to the extent provided in Sections 3 and 4 above, shall be eligible to participate in the health and hospitalization insurance program, the employee life insurance program, the dependent life insurance program, the long-term disability insurance program, the pre-tax dependent care program, the same-sex domestic partner benefit program, the Healthy Premium and/or other wellness or health incentive programs, and adoption assistance program applicable to exempt and managerial employees of The Washington Post generally, in accordance with the terms of such programs as they may from time to time be modified by the Publisher. During the term of this Agreement and after its expiration, these plans are subject to change at the same time and in the same manner as for exempt and managerial employees, and such changes shall not be subject to arbitration or bargaining.

      (b)   During the term of this Agreement and after its expiration, the Publisher shall have the right to make plan design changes, changes in employees' percentage contributions, changes in connection with the Affordable Care Act (or any successor federal or state insurance statute or regulation), including changes to the measurement and stability periods for part-time employees and changes to avoid or offset ACA penalties and taxes (or penalties or taxes imposed by any other federal or state laws or regulations), and changes in the benefits offered under the Benefits Plan, including changes in coverage, deductibles, incentives, surcharges and co-payments, at the same time and in the same manner as for exempt and managerial employees, and such changes shall not be subject to arbitration or bargaining. However, before any substantial change is made by the Publisher in the benefits or contributions described in this Article, The Post will meet and confer with the Guild as to such changes. In addition the parties may establish a joint committee to examine questions concerning health care benefits and insurance costs and to make recommendations to the Publisher.

      (c)   Nothing in this Article precludes either party from seeking to renegotiate, during bargaining for a successor collective bargaining agreement, the terms and conditions of Guild-covered employees' participation in the plans described in this Article to be effective under a successor agreement.

7. The Publisher reserves the right to terminate the coverage of any employee who fails to contribute the employee's portion of the premium or who enrolls ineligible dependents in the plan. Coverage may be terminated as of the first day of the month following the month in which the employee failed to make such contribution, provided the Publisher furnishes written notice to the employee beforehand to give the employee the opportunity to make up the payment due.  If an employee is absent from work on an approved leave of absence for a period of six months or more, then the Publisher shall not be required to make the Publisher's percentage contribution on behalf of such employee after such six-month period, provided that The Post shall furnish written notice to the employee of discontinuance of paying its portion of the premium in sufficient time to enable the employee to arrange to pay the premium without loss in coverage.  The Post shall honor any agreement between it and an employee for a longer period of coverage during the employee's absence from work.

8. **During the term of this Agreement, the Publisher may change employee benefit deductions from biweekly to semi-monthly. The Publisher agrees to meet and confer with the Guild prior to implementing such a change to the timing of these salary deductions.**

**TENTATIVE AGREEMENT**
Date: March 11, 2021
Time:

## ARTICLE XXVII - DURATION AND RENEWAL

1.   This Agreement shall be effective on July 13, 2018 and shall remain in effect through **June 30, 2022** ~~July 12, 2020~~.

2.   Questions of renewal or amendment of this Agreement are not subject to arbitration.