## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WASHINGTON-BALTIMORE NEWS GUILD, LOCAL 32035,**

                 **Plaintiff,**

        **v.**

**THE WASHINGTON POST,**

                 **Defendant.**

**Case 1:22-cv-02484-CKK**

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

In its zeal to avoid its obligations under the parties collective bargaining agreement and federal law to arbitrate two pending grievances, The Washington Post ("Post") asks this Court to accept a transparent effort to re-write the parties contract, its misapprehension of settled federal labor law, and its erroneous interpretation of Article XXIII(6) of the parties' latest labor agreement. As both the Farhi and Sonmez grievances were filed while the collective bargaining agreement was in full force and effect, the Post is clearly obliged to arbitrate the grievances on their merits. Contrary to the Post, there is no "express exclusion or other forceful evidence" to permit the Post to escape its contractual obligations to the Guild and to the employees it represents.

There is no dispute over the basic facts that bring the parties to this Courthouse. The parties' last collective bargaining agreement was extended by the parties to June 30, 2022. That agreement, as we noted in our Motion for Judgment on the Pleadings, expressly provides for job

security for all employees in the bargaining unit and prohibits the Post from "disciplin[ing], suspend[ing], or discharge[ing]" any employee without "just cause."  Comp. Exh. 1(a), pp. 25-26. Reporter Paul Farhi was suspended by the Post for five days on or about March 10, 2022; on March 14, 2022, the Guild promptly filed a grievance to contest the suspension as a violation of the job security provisions of the contract; and on July 15, 2022, after the grievance steps of the contract were completed, the Guild notified the Post that it was submitting the grievance to arbitration.  Similarly, reporter Felicia Sonmez was informed on June 9, 2022, that her employment with the Post was terminated. The Guild immediately, on June 15, 2022, filed a grievance to challenge the termination as without just cause, and, on August 1, 2022, after the grievance steps of the contract were completed, notified the Post that it was submitting the grievance to arbitration.

In both cases, the Post refused to arbitrate, and now argues to this Court that the opening phrase of Article XXIII(6) of the contract requires it to arbitrate grievances "only" "[d]uring the term of this Agreement or any extension thereof…"  Post Mem., p. 1. And while the Post repeatedly posits this erroneous theory in its Motion for Summary Judgment, "only" appears nowhere in the language of Article XXII(6).[1]

The Legal Standard of Review

It is well-established that "summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law." *American Postal Workers Union v. United States Postal Service,* 65 F.

---

[1]  Defendant's Memorandum continually – we count at least six times – seeks to present the Guild contract language as providing that arbitration is available "only" during the term of the contract.

Supp. 3d 134, 140 (D.D.C. 2014). Further, where, as here, "both parties file cross-motions for

summary judgment, 'each must carry its own burden under the applicable legal standard.'

*Ehrman v. United States,* 429 F. Supp. 2d 61, 67 (D.D.C. 2006) .. . ."  65 F. Supp. 3d at 141.

*Accord: Benton v. Laborers' Joint Training Fund,* 210 F. Supp. 3d 99, 104-105 (D.D.C. 2016).[2]

<u>The Post is Obligated to Arbitrate The Farhi and Sonmez Grievances</u>
<u>Filed During the Term of the Contract</u>.

        As set forth in our Motion for Judgment on the Pleadings, there is no dispute that federal

labor law applies a presumption of arbitrability to grievances, which as is the case here, are filed

during the term of a labor agreement. This rule arises out of the *Steelworkers Trilogy,* and in

particular *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 US 574 (1960). *Accord:*

*Washington Mailers Union v. Washington Post Co.,* 233 F.3d 587, 589 (D.C. Cir. 2000).[3]

        When a collective bargaining agreement has expired, the mere expiration of the contract

does not displace the presumption of arbitrability if the dispute "aris[es] under the contract."  In

*Litton Financial Printing Div., A Division of Litton Business Systems, Inc., v. National Labor*

*Relations Board,* 501 U.S. 190, 205-06 (1991), the Court held that the presumption recognized

by *Nolde Bros., Inc. v. Local 358, Bakery & Confectionery Workers Union,* 430 U.S. 243 (1977),

"is limited to disputes arising under the contract."  The *Litton* Court quickly explained:

>         A postexpiration grievance can be said to arise under the contract only *where it*
> *involves facts and occurrences that arose before expiration,* where an action taken
> after expiration infringes a right that accrued or vested under the agreement, or

---

[2]  As noted, Plaintiff initially filed a Motion for Judgment on the Pleadings. "The court should
grant a motion for judgment on the pleadings if the movant 'is entitled to judgment as a matter of
law.' *See Burns Int'l Sec. Servs. v. Int'l Union,* 47 F.3d 14, 16 (2d Cir. 1995)." *Bowman v.*
*District of Columbia,* 562 F. Supp. 2d 30, 32 (D.D.C. 2008). Where, as this case is now postured,
" a court considers matters outside the pleadings, then the court shall treat the motion as one for
summary judgment pursuant to Rule 56." *Id at n. 2.*

[3] There, the Court of Appeals observed that if there are "equally plausible" readings of the
contract, "then we must direct the district court to order arbitration." 233 F. 3d at 591.

where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

501 U.S. at 205-06; italics added.[4]  Here, even if, *hypothetically,* the Farhi and Sonmez grievances had been filed *after* expiration and, thus, would have been "postexpiration grievance[s]," both clearly involve "facts and occurrences" that took place prior to the expiration of the collective bargaining agreement. Under *Litton,* both would have clearly been arbitrable. The Post should know this well. If a post-expiration grievance "arises under" the expired contract, then the grievance "fall[s] within the presumption of post-expiration arbitrability." *Washington Mailers Union Local M-29 v. The Washington Post,* 699 F. Supp. 2d 130, 133 (D.D.C. 2010).[5]

But grievances filed *during the term* of a contract, as here, "are unquestionably within the arbitration clause," are governed by the presumption, and are arbitrable notwithstanding the expiration of the labor agreement. *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 554 (1964). In *Unite HERE Local 25 v. Madison Ownership, LLC,* 850 F. Supp. 2d 219 (D.D.C. 2012), the union sued to compel the leasehold owner and fee owner to arbitrate a grievance related to the sale of the hotel. The court noted a dispute as to whether the collective bargaining agreement was in effect during the relevant period but held that if so then the claims would be subject to arbitration. 850 F. Supp. 2d at 227-28. Similarly, in *Hotel & Restaurant Employees Union, Local 25 v. Potomac Hotel Group,* 1988 WL 57266 (D.D.C. 1988), the court held that a

---

[4] In that case, the grievance challenged a layoff which occurred a year after the contract expired. The Court concluded that the grievance did not involve accrued or vested rights, or rights that continue after expiration. 501 U.S. at 209.

[5]  There, the court held that a grievance filed five years after the contract expired was arbitrable as it concerned vested rights and, thus, "arises under" the expired contract. 699 F. Supp. 2d at 135-36.

grievance over whether certain employees were covered by the contract was arbitrable. There, the contract excluded from arbitration "differences arising incident to negotiation of terms of a new Agreement," and the employer had refused to arbitrate on the ground that the dispute was discussed during contract negotiations. The court, noting the "strong legal presumption in favor of the arbitrability of labor disputes," had little difficulty rejecting that defense, and held that to do so would "have us adopt an unduly broad and unworkable interpretation of the exclusionary clause in question." Slip. at 1-2.

In short, there is a well-settled and strong federal labor policy of a presumption in favor of arbitration over grievances filed during the life of a labor agreement, exactly the case before this Court. As to grievances filed after a labor agreement has expired, *Litton* does note that the presumption would not automatically be applied "wholesale." 501 U.S. at 209.[6]  But to exclude any grievances from arbitration where the contract contains an arbitration clause, as the Court held in *AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 651-52 (1986), there would need to be an "express exclusion or other forceful evidence" to "unmistakably demonstrate that a particular grievance was not to be subject to arbitration." "[D]oubts," the Court held, "should be resolved in favor of coverage." *Id. Accord: Warrior & Gulf, supra* at 584-85 ("only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail"). Where the contract language is "subject to a reasonable interpretation which would permit arbitration," arbitration is appropriate. *TRT Telecommunications Corp. v.*

---

[6]  The Post takes a swipe at the Guild by pointing out that the Union cited *Litton* only in a footnote in its previous memorandum. But the fact of the matter is that while *Litton* reiterates principles of labor law applicable to the instant case, the core of the issues before the Court concerned arbitration of grievances filed after the expiration of a labor agreement. As noted, that is not the case here.

*Local 111, American Communications Association, Communications Trade Division, International Brotherhood of Teamsters,*719 F. Supp. 1,4 (D.D.C. 1989).[7]

Despite this admonition, the Post asks this Court to rely on *AFSCME Council 25 v. Wayne County,* 290 Mich. App. 348 (2010) and *Lansing Newspaper Guild v. Federated Publications, Inc.,*1995 WL 871139 (E.D. Mich. 1995) to support its improper refusal to arbitrate. Yet, both of those cases actually bolster the Guild's position in this case. In *Wayne County,* the issue before the court concerned a grievance over retiree health benefits that was filed 5 weeks after the collective bargaining agreement had expired. The contract language provided that if "differences should arise between the Employer and the Union during the term of this Agreement" the grievance-arbitration procedure would apply. In its ruling that the grievance was not arbitrable because it arose *after* expiration, the court paused to contrast that case with what would have prevailed, under the same contract language, if the grievance *predated* expiration. "Thus, if the dispute had arisen 'during the term of [the] Agreement,' article 10.01 would seemingly require that the parties employ the grievance procedure of the CBA, including arbitration." 290 Mich. App. at 351. Thus, *Wayne County* squarely provides further support for the proposition that the Post's refusal to arbitrate the instant grievances is unlawful.

The Post fares no better in its reliance on *Lansing Newspaper Guild.* There, the collective bargaining agreement defined "grievance" as "any dispute arising during the term of this

---

[7] The Post takes exception to the Guild's reference to *Service Employees International Union Local 32BJ v. Diversified Services Group, Inc.,* 958 F. Supp. 2d 166 (D.D.C. 2013), cited in our initial memorandum, on the ground that the case did not cite *Litton. Diversified* involved a claim by the company that it was not bound by a collective bargaining agreement when it terminated employees – the subject of the grievance. Notably, the court relied on both *Washington Mailers Union* and *AT&T* to rule that if there is a "plausible" argument that the grievances are arbitrable and if the contract "is susceptible of the interpretation proffered by the union" that "settles the matter." 958 F. Supp. 2d at 176-77.

Agreement."  The grievance in that case involved a discharge that took place after the expiration of the contract, thus causing the court to conclude that there was no obligation to arbitrate the post-expiration grievance. Manifestly, *Lansing Newspaper Guild* has no application here where both Farhi and Sonmez were disciplined and both grievances were filed during the term of the Guild-Post labor agreement.

Furthermore, there is, in any event, no "express exclusion or other forceful evidence" here to deny the Guild the right to have arbitrators determine whether there was just cause for the discipline of Farhi and Sonmez. Instead, the Post rests its case entirely on the introductory phrase of Article XXII(6) stating that "[d]uring the term of this Agreement or any extension thereof, the grievance and arbitration procedures of the Agreement shall be the sole and exclusive means of settling any and all disputes between the Guild or the employees covered by this Agreement and The Publisher relating to the interpretation and application of this Agreement…."  Comp. Ex. A, p. 54. Clearly, that brief language does not expressly negate the Post's post-expiration obligation to arbitrate grievances filed while the contract was in force. Any doubt of this conclusion may be dispelled by examining the entire paragraph which simply sets forth the parties' preference for disputes to be resolved in arbitration without precluding the right to seek redress under the National Labor Relations Act or other statutes or laws. The provision states, in full:

> During the term of this Agreement or any extension thereof, the grievance and arbitration procedures of the Agreement shall be the sole and exclusive means of settling any and all alleged violations of any specific provision of the Agreement, except as otherwise provided in the Agreement. While the parties favor arbitration of all disputes concerning this Agreement and the employees covered by this Agreement, this Section shall not be deemed to preclude either party or any employee from exercising their respective rights to seek judicial or administrative relief concerning equal employment opportunity, occupational safety and health, the Fair Labor Standards Act, the National Labor Relations Act, or other laws governing employment relations or employment. Accordingly, the Publisher shall not engage in any lockout, nor shall either the Guild or any employees covered by this Agreement engage in any strike or sympathy strike (other than a by-line strike), work stoppage, slowdown, concerted refusal to work or other

interference with or stoppage of work; however, to the extent provided by law, Guild-covered employees may continue to engage in legally protected, concerted activities, e.g., signing a petition or distributing leaflets.

On its face, there is no express exclusion from arbitration of grievances filed during the term of the contract simply because the contract has expired. Manifestly, there would need to be an explicit, "unmistakable" ban on arbitration after expiration to sustain the Post's refusals to arbitrate in this case. No such language exists in the parties' last contract.

Indeed, the juxtaposition of the rather philosophical language in Article XXIII(6) against other language where the contract does explicitly preclude arbitration only underscores this conclusion. As noted, there is not a word in Article XXIII(6) which renders contractual grievances not arbitrable simply because the labor agreement has expired. By contrast, there are a number of provisions in the contract which do state, explicitly, that certain issues cannot be grieved and/or arbitrated at all. For example, and just within other paragraphs of Article XXII, Grievance Procedure, the parties agree:

- "Matters left unrestricted by a specific provision in this Agreement, and matters left to the discretion of the Publisher throughout this Agreement, shall not be subject to arbitration."  Comp. Ex. 1, Art. XXIII(4)(c), p. 53

- "Reprimands and disciplinary actions without loss of pay shall be subject to the grievance procedure but shall not be arbitrable."  Comp. Ex. 1, Art. XXIII(4)(d), p. 53.[8]

---

[8]  This explicit ban on arbitration over these levels of discipline was proposed by the Post in the May 1989 negotiations, discussed *infra,* when the Post proposed the new language in Article XXII(5), and the difference in text speaks volumes. The distinction also reinforces the conclusion that the "during the term" contract language, which was a phrase in the prior contract, hardly fulfills the requirement in *AT&T* that there must be the most explicit and forceful language to bar the arbitration of contractual grievances.

- "Matters affecting relations between employees and The Post may be discussed by Guild and Post representatives, however such subjects shall not be subject to arbitration."  Comp. Ex. 1, Art. XXIII(4)(e), p. 53.

Clearly, the parties know how expressly to preclude arbitration, as they have done over these other issues, and the absence of such prohibiting language in Article XXIII(6) further demonstrates that this language does not bar arbitration of pre-expiration grievances.[9]

As the Post notes in its Memorandum, the courts, not to mention arbitrators, often refer to the parties' bargaining history to interpret arbitration language. Post Mem. P. 7; *Carbon Fuel Co. v. United Mine Workers of Am.,* 444 U.S. 212, 219-22 (1979). In this case, the bargaining history of Article XXIII(6) further establishes that the Post is overreaching in its unfounded effort to avoid arbitration over the propriety of its discipline of the two reporters. As explained in the Declaration of Lance Compa, the Assistant Administrative Officer of the Guild and "second chair" in the 1989 negotiations that produced Article XXIII(6), the language has nothing whatsoever to do with prohibiting arbitration after the contract expires. The prior collective

---

[9] Additionally, there are several other instances addressed elsewhere in the collective bargaining agreement where the parties have similarly and expressly agreed to exclude those particular issues from the grievance and/or arbitration machinery of the contract. See Comp. Exh 1., Article II(5)(addressing certain meet and confer issues and stating that any disputes "will not be arbitrable"; Article VI(11)(disputes concerning this section "shall be subject to the grievance procedure but shall not be arbitrable under Article XXIII"); Article VI(15)(certain commuter benefit program issues "shall not be subject to bargaining or arbitration"); Art. XVII(11)(b)(disagreements among the fair employment standing committee "shall not be subject to the grievance procedures set forth in Article XXIII") Art. XIX (disagreements before the labor-management committee "shall not be subject to the grievance and arbitration procedures set forth in Article XXIII, nor shall the committee have the right to receive or adjudicate any grievance").  Thus, once again, the comparison between these express prohibitions and the general language in Article XXIII(6) could not be more revealing. The conclusion is thus inescapable that the general language in Article XXIII(6) does not bar arbitration of pending grievances.

bargaining agreement was effective by its terms from November 28, 1983, to July 9, 1986, and

contained similar language in the grievance-arbitration provisions of that agreement. Article

XXII(2) of the 1983-96 contract simply provided that "[a] grievance, as defined in Section 1

above (except renewal of this Agreement) which occurs during the term of this Agreement,

including any question of whether a grievance is arbitrable" may be submitted to "final and

binding arbitration."  Compa Decl., Ex. 1.

When the parties attempted to negotiate a successor contract, the Post refused to provide

the Guild with information it requested for the negotiations. The Guild then filed charges against

the Post with the National Labor Relations Board alleging that the refusal to provide the

information violated the Post's statutory obligation to bargain in good faith. In August 1987, the

Post declared that the parties were at an impasse in the negotiations, and shortly thereafter the

General Counsel of the National Labor Relations Board issued a formal Complaint against the

Post alleging that its refusal to provide the requested information violated the National Labor

Relations Act. The NLRB case was scheduled for a hearing before an NLRB Administrative

Law Judge in early 1989. With the NLRB hearing approaching, the parties in early 1989 engaged

in settlement discussions and, in the end, resolved the unfair labor practice issues. As part of the

resolution of the charges, the parties agreed to resume negotiations for a successor labor

agreement. Compa Decl., ¶¶3-4.

The negotiations commenced on May 1, 1989, and concluded on or about July 27, 1989,

when the parties initialed the terms of a new agreement. The Guild's opener, presented on May 1,

1989, reflected a few modest changes to the steps of the grievance process. Compa Decl., Ex. 4.

The Post presented its opening non-economic proposals to the Guild on May 4, 1989. As is

customary with labor negotiations, Frank Havlicek, the Post's chief negotiator and Vice President

for Labor Relations, did a "walk-through" of the proposal to explain to the entire Guild

committee the purpose of the new paragraph it was proposing to add to the "Grievance

Procedure," what was then Article XXII.  The Post's initial proposal for that paragraph read:

> 5. During the term of this Agreement or any extension thereof, the grievance and arbitration procedures of the Agreement shall be the sole and exclusive means of settling any and all disputes between the Guild or the employees covered by this Agreement and The Publisher relating to the interpretation and application of this Agreement, except as otherwise provided in the Agreement, or any dispute arising under the National Labor Relations Act.  Accordingly, the Publisher shall not engage in any lockout, nor shall either the Guild or any employees covered by this Agreement promote, support, or engage in any strike, sympathy strike, slowdown, or any other concerted disruption or interference with The Post's operations.

Compa Decl., Ex. 5. In his statement to the Guild when he presented the language, Havlicek

made it clear that the purpose of this new paragraph was to have the parties agree that all

disputes that otherwise might be presented to the National Labor Relations Board would, instead,

be deferred to the parties' grievance and arbitration process. Given that the parties had just been

before the NLRB, Havlicek opposed going to the Board and, instead, asked that all such disputes

be handled under the grievance and arbitration provisions of the agreement.[10]

> In section 5, on the other hand, you will see some comprehensive arbitration language including any matter that is subject to the National Labor Relations Act. Washington Post would oppose that.
>
> We do not go down to the NLRB any long, either of us, if we are able to reach an agreement and file unfair labor practice charges. All of those kinds of disputes would be deferred.
>
> Under the law they can be mandatorily deferred to arbitration by mutually selected mutual third parties,  During the term of this Agreement, or any extension thereof, the grievance arbitration procedures of the Agreement shall be the sole and exclusive means of settling any and all disputes between the Guild or the employees covered by this Agreement and the publisher, lending to the

---

[10] In advance of the negotiations, the parties agreed to retain the services of Diversified Reporting Service, a court reporting company, to prepare written transcripts of each bargaining session. The quoted statements are from the transcript of the May 4, 1989, session, appended to the Compa Declaration as Exhibit 6.

> interpretation and application of this Agreement, except as otherwise provided in the Agreement or any dispute arising under the National Labor Relations Act.
>
> There were further substantive change, and again, this is a matter of language that is found in hundreds of labor contracts throughout the country, is the following sentence: Accordingly, the publisher shall not engage in any lockout nor shall the Guild or any employees  covered by this Agreement promote, support, or engage in any strike, sympathy strikes, slowdown, or any other concerted disruption or interference with Post operations during the term of the Agreement and the arbitration procedures under the Agreement.

At that juncture, Sandra Polaski, who was the Guild's chief spokesperson and Administrative Officer, asked Havlicek whether this language was intended to cover disputes just over the interpretation of the Agreement or other disputes as well, and inquired as to the Post's view of the standard an arbitrator would use. Havlicek's response further underscored that the purpose of this new language was to funnel all disputes through the grievance-arbitration process during the term of the contract rather than have some go to the NLRB.

> It is very clear actually. Under the Collier case and many many other decisions of the National Labor Relations Board, where there is comprehensive arbitrational [sic] language and agreement, the Board will always defer to the decision of an arbitrator.
>
> The arbitrator is supposed to make a decision based on the applicable law. The National Labor Relations Act, the decisions of the NLRB, decisions of arbitrators and others in the area and judges and the rest are all the appropriate standards for the arbitrators.[11]

Havlicek's further comments underscore that under the Post opening proposal the Guild would essentially waive its right to go to the NLRB during the term of the contract and, instead, all matters would be resolved through the grievance arbitration procedure.[12]  Havlicek stressed

---

[11]  Havlicek's reference to "Collier [sic]" was to *Collyer Insulated Wire,* 192 NLRB 837 (1971), where the National Labor Relations Board defined the circumstances under which it would defer its consideration of unfair labor practice charges to arbitration under the parties' labor agreement.

[12] The Post clearly recognized that under its proposal any waiver of the Guild's right to file charges with the NLRB would be effective only during the term of the agreement.

several times that in his view this approach of deferring all issues to the grievance arbitration process, is like other provisions of the contract, "a fundamental part of creating a stable relationship between Local 35 and the Post."  Compa Decl., Ex. 6.

While the parties ultimately agreed to the basic concept and opening phrase of the Post's proposal, the final text reflected both a preference for labor arbitration as well as the explicit preservation of the rights of the parties and the employees to seek redress in other forums, including at the NLRB.  As reflected by the text of the proposal and the transcript of the bargaining session, there was absolutely no discussion at the table that the Post's proposal was intended to or would affect the Guild's fundamental right to arbitrate grievances filed during the term of the contract even after it expired. The expression "during the term of this Agreement" was a phrase that predated those negotiations in a paragraph addressing the arbitration of grievances.[13]

Thus, the bargaining history of Article XXIII(6) confirms that the purpose and intent of that paragraph had nothing whatsoever to do with a limitation on the right of the Guild to arbitrate pending grievances once the contract expired.[14] Instead, the goal of the Post was to persuade the Guild to agree to a waiver of its statutory right to file charges with the NLRB while the contract was in effect. The final product of those negotiations was manifestly a compromise – language supporting the grievance and arbitration procedure as a means of resolving labor

---

[13]  The 1983-86 collective bargaining agreement stated in Article XXII, Grievance Procedure, Section (2) that "[a] grievance, as defined in Section 1 above (except renewal of this Agreement) which occurs during the term of this Agreement, including any question of whether a grievance is arbitrable" may be submitted to arbitration. See Compa Decl, Exhibit 1, emphasis added.

[14] As Article XXII(5) had, by its terms and purpose, nothing at all to do with a limitation on the arbitration of pending grievances when a contract expires, there would have been no occasion for the parties even to consider language such as the provision cited by the Post from the Washington Mailers Union contract. Post Mem., p. 16.

disputes without disturbing the rights of all concerned to file charges or complaints elsewhere. The text also underscores the Post's commitment and that of the Guild to "favor arbitration of *all* disputes concerning this Agreement…." Emphasis added.[15] Taken together, this documented bargaining history only further demonstrates the total absence of any "other forceful evidence" to "unmistakably" establish that Article XXIII(6) was intended to terminate the Guild's right to have pending grievances arbitrated merely upon the expiration of the contract. *AT&T, supra.* To the contrary, the bargaining history fully confirms that the Post is engaged in a misguided effort to invoke Article XXIII(6) as an excuse for its refusal to arbitrate the Farhi and Sonmez grievances. The "forceful evidence" here demonstrates beyond question that Article XXIII(6) does not justify the Post's adamant refusal to arbitrate these pre-expiration grievances.[16]

## CONCLUSION

For the foregoing reasons, we urge this Court to deny the Post's Cross-Motion for Summary Judgment and to order the Post to arbitrate both the Farhi and Sonmez grievances.

Respectfully submitted,

        /s/ Robert E. Paul
Robert E. Paul (194787)
Law Offices of Robert E. Paul, PLLC
1025 Connecticut Ave. NW, Suite 1000
Washington, DC 20036
(202) 857-5000
(202) 327-5499 fax
rpaul@robertepaul.com

Attorneys for Plaintiff
Washington-Baltimore News Guild

---

[15] See Compa Decl., Ex. 8.

[16] In light of the Post's Motion, we no longer press our alternate theory that the arbitrability issues in this case are to be determined by the arbitrators.